473 A.2d 459

**Eileen A. HOLSTON**

v.

**Alvan M. HOLSTON, Jr.**

**No. 552, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 6, 1984.

Certiorari Denied Aug. 20, 1984.

312

T. Bruce Hanley, Baltimore, for appellant.

Charles E. Rosolio, Baltimore, for appellee.

Argued before LISS, BISHOP and BLOOM, JJ.

BLOOM, Judge.

The Circuit Court for Baltimore County granted appellant, Eileen A. Holston, a divorce a vinculo matrimonii from appellee, Alvan M. Holston, Jr., on February 14, 1983. In addition to the divorce, which was granted on the basis of

appellee's adultery, the decree awarded appellant custody of the parties' five minor children, alimony for three years at a rate of $150 per week, and child support of $100 per week per child. The decree also provided for the sale of the marital home with the proceeds to be divided equally between the parties, granted a monetary award of $35,000 to appellant, and ordered appellee to pay $3,100 toward appellant's counsel fees and expenses.

When the parties were married in August 1965, appellee was entering his junior year of dental school. Appellant was employed as a secretary at the University of Maryland Medical School where she earned $5,000 per year. She was employed full time until her husband's graduation in June 1967. During that time, appellant's earnings constituted approximately 60 to 70 percent of the parties' living expenses. The remaining expenses were paid for with the earnings from appellee's summer employment.

After graduating from dental school, appellee served as a dentist in the United States Army. Upon his discharge from military service, he began his present career as an instructor at the University of Maryland Dental School. At the time of the divorce, appellee was an assistant professor and director of a graduate program of advanced general dentistry. In addition, he held numerous consulting positions and practiced dentistry at the school through a faculty program called FDSP Associates, P.A.

The dissolution of the parties' marriage was precipitated by appellee's departure from the marital home on November 23, 1980, after several months of steadily deteriorating marital relationship. Attempts at reconciliation failed, and appellant eventually filed a bill of complaint seeking a divorce. Although satisfied with the court's granting of the divorce, appellant brought this appeal because she was not satisfied with other portions of the decree. Specifically, appellant contends:

 I. The trial court erred in denying appellant's request that appellee pay for and/or contribute toward the

private and/or parochial education of the five minor children of the parties.

II. The trial court erred in the granting of a monetary award to appellant for the court failed to determine what items of property were marital property; the court's valuation of marital property was unsupported by the evidence and the court did not apply the nine statutory factors in granting the marital award.

III. The trial court erred in failing to grant appellant alimony for an indefinite period as provided in article 16, § 1(c)(1)(ii), of the Annotated Code of Maryland.

IV. The trial court abused its discretion in granting insufficient counsel fees and costs to appellant in view of the evidence presented.

## I. *Education Expenses*

The parties' marriage produced five children. The oldest, Elizabeth Ann (Betsy), attended public schools for the first and second grades and Cathedral School in the third grade. When her parents learned that Betsy was a gifted child, they enrolled her in St. Paul's School. The parties later became dissatisfied with St. Paul's and enrolled Betsy in the Roland Park Country School, which she was attending at the time of the divorce.

The second child, Alvan (Trippy), was initially enrolled at Cathedral School and then followed Betsy to St. Paul's School. As a result of his parents' dissatisfaction with St. Paul's, Trippy was enrolled in the public school system where he participated in the gifted and talented program. Similarly, the third child, Timothy, attended St. Paul's in first and second grades and then followed his brother into the public school system.

At the time of the divorce proceedings, the two younger daughters, Katherine and Lauren, were attending the Church of the Good Shepherd School, a church-sponsored pre-school program.

Appellant contends that the lower court erred in refusing to require appellee to contribute toward the children's tuition expenses for private and parochial education. At trial, appellant testified that she and appellee had planned for each child to enroll in private school after completion of the sixth grade. Although Trippy remained in public school beyond the seventh grade, this was partly due to his enrollment in the gifted and talented program at Dumbarton Middle School. Both parties testified at trial, however, that they had at least contemplated enrolling Trippy at Loyola High School for the upcoming school year.

In arguing that appellee should pay for the children's private education expenses, appellant relies upon our decision in *O'Connor v. O'Connor,* 22 Md.App. 519, 323 A.2d 632 (1974). In that case, the chancellor granted the ex-wife's petition seeking increased alimony and child support. The ex-husband attacked the increase in child support "largely upon the fact that some of the support monies will be used by the mother to finance the education of the remaining minor children in 'parochial schools.'" *Id.* at 522, 323 A.2d 632. After noting that "the law in a child support case is always what is in the best interest of the child, *i.e.,* the needs of the child in view of the child's station in life, tempered only by the financial ability of the parents to provide the requisites of the child," *id.* (citations omitted), we examined the particular facts of the case and held that the chancellor was not clearly erroneous in increasing the child support.

> The obvious financial ability of the father to pay for his childrens' [sic] private schooling, the pattern of education which had been set for the children prior to the divorce, the station in society occupied by the parties and the educational needs of the children create a set of circumstances, when considered in their totality, which clearly justify, in our opinion, the increased child support payments ordered by the chancellor.

*Id.* at 526, 323 A.2d 632.

Appellant claims that the above quoted portion of *O'Connor* established "factual criteria to be analyzed in determin-

ing whether a noncustodial spouse should be financially responsible for the private education of his children." Appellant then asserts that "[t]he record below fully satisfies each of the factors set forth in *O'Connor*. . . . "

Appellant's reading of *O'Connor,* however, is a bit too broad. *O'Connor* did not hold that a chancellor *must* rigidly weigh those particular factual criteria in deciding whether to order the noncustodial parent to pay for the child's private education. Rather, *O'Connor* held that, based on the specific set of circumstances presented by that case, the chancellor was not clearly erroneous in increasing the support payments for the minor children. Indeed, we were careful in stating that we were not creating a general set of criteria but were only ruling upon the specific facts before us.

> While we do not endeavor at this time to formulate any general rule or principle regarding the responsibility of a father to provide his child or children with an education in the private secondary school sector . . . we believe that in the factual posture of this case, the chancellor below was not clearly erroneous in increasing the support payments for the minor children, knowing that a part of those funds would be expended to finance the education of the parties' minor children in parochial schools.

*Id.* at 525, 323 A.2d 632.

■ *O'Connor,* therefore, presented certain factors which are permissible considerations in ruling on the issue of child support. While *O'Connor* did not attempt to restrict future chancellors to the use of those factors, certain criteria are so immaterial that a chancellor's reliance upon them will constitute reversible error. In the instant case, the chancellor relied upon just such a factor. In refusing to order appellee to pay for the children's tuition expenses, the chancellor stated

> I cannot understand how the custodial parent can insist that the children go to private schools, because this was once discussed and approved by both parents, and at the

same time allow *the attitude that presently exists and the hostility that presently exists and the isolation of a father from any decisions affecting the children to continue.* (emphasis added).

The amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent. The proper inquiry, as we have often stated, is what is in the best interest of the child. In reaching that conclusion, the chancellor must balance the needs of the child against the parent's financial ability to meet those needs.

Appellee's reliance upon *Hardisty v. Hardisty,* 183 Conn. 253, 439 A.2d 307 (1981), is misplaced. The chancellor here was not faced with a father's principled objection to private secondary schooling as was the chancellor in *Hardisty.* Furthermore, the child in *Hardisty* was enrolled for the first time in private school after the dissolution of the marriage and without the father's consultation. In our case, the chancellor was not faced with such a situation nor did he rely upon any similar considerations. A chancellor's concern "with the present estrangement of the children from their father," while certainly understandable, is not a proper consideration in determining the amount of child support to be paid by the father. The chancellor, in considering an inappropriate factor in setting the amount of child support, clearly abused his discretion. *See Davis v. Davis,* 280 Md. 119, 126, 372 A.2d 231 (1977); *German v. German,* 37 Md. App. 120, 121, 376 A.2d 115 (1977).

We wish to emphasize that we are not holding that the chancellor's decision not to require appellant to pay the costs of private or parochial school education for his children was wrong. We merely hold that there was an abuse of discretion in the decision making process. In remanding to permit the chancellor to reconsider this issue, we are not suggesting that an application of proper criteria will necessarily mandate a different result.

## II. *Monetary Award*

■ Md.Cts. & Jud.Proc.Code Ann. § 3–6A–05(b) authorizes a court, in granting an absolute divorce, to "grant a monetary award as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded." The monetary award is "intended to compensate a spouse who holds title to less than an equitable portion" of that property. Note, *Property Disposition Upon Divorce in Maryland: An Analysis of the New Statute,* 8 U.Balt.L.Rev. 377, 386 (1979). We have previously held that once a chancellor decides to make a monetary award, he becomes bound to follow two statutorily-mandated procedures in addition to consideration of the nine [statutory] factors. Section 3–6A–05(b) requires that as a precondition to an award "[t]he court *shall* determine the value of all marital property" [emphasis supplied]. This, in turn, requires a determination of what is marital property, and § 3–6A–05(a) directs that "the court *shall* determine which property is marital property if the division of property is an issue" [emphasis supplied].

*Grant v. Zich,* 53 Md.App. 610, 614, 456 A.2d 75 (1983), *cert. granted,* 296 Md. 110 (1983).

■ Appellant contends that the chancellor, in granting the monetary award, failed to find which items of property were marital property. Appellant further contends that the chancellor was clearly erroneous in his valuation of the property which he did find to be marital property and that he failed to apply the nine statutory factors required in determining the amount of the monetary award. After examining the chancellor's opinion, we conclude that he did not apply the nine statutory factors, and that in itself requires us to vacate the award. Once the chancellor decides to make a monetary award, he "*shall* then consider each of the nine factors enumerated in § 3–6A–05(b) in determining a fair and equitable amount and the method of its payment." *Ward v. Ward,* 52 Md.App. 336, 339, 449 A.2d 443 (1982) (emphasis added). The Court of Appeals has said

that "part (b) of section 3–6A–05 *commends* the court to determine the value of all such marital property." *Deering v. Deering,* 292 Md. 115, 121, 437 A.2d 883 (1981) (emphasis added). Here, the chancellor made no attempt to apply those nine factors in determining the amount of the award. Rather, he merely made an award equal to one-half of the value of certain marital property. Such a procedure is improper.

Furthermore, the chancellor failed to include certain items of property in his listing of marital property and, as a result, failed to consider the value of those items. He did not include the former marital residence which the parties owned as tenants by the entireties nor did he designate a certain Datsun automobile purchased by appellee during the marriage or a sailboat acquired by the parties as tenants by the entireties. Moreover, despite evidence from appellant that her father had made a gift to her of $24,000 of which $10,000 went toward the purchase of the sailboat, the chancellor made no determination as to whether the boat was partially marital and partially non-marital property. *See Harper v. Harper,* 294 Md. 54, 448 A.2d 916 (1982). Likewise, appellant complains that the chancellor made no determination with respect to her assertion that some of the household personalty was non-marital property which had either belonged to her prior to the marriage or had been given to her during the marriage.

Instead, the chancellor merely ordered the house to be sold and the proceeds divided equally between the parties pursuant to § 3–6A–04(b)(2) while awarding the household personalty and family car to the wife and the Datsun and sailboat to the husband. The chancellor may well have concluded that it was unnecessary to regard the house as marital property or as a factor to be considered in making a monetary award since he was ordering it to be sold and the proceeds divided equally between the parties. Nevertheless, it was unquestionably marital property and the chancellor was required to evaluate it as such. Unless its value and each party's estimated share of its sale proceeds are taken

into account, the court cannot properly consider *all* of the nine factors enumerated in § 3–6A–05(b) in determining a fair and equitable amount of monetary award. The nature and extent of all property owned by each spouse and the financial condition of each spouse at the time of the award are two of those statutory factors. § 3–6A–05(b)(2) and (3).

The chancellor might well have believed that in awarding the Datsun and the sailboat to the husband while awarding the household personalty and family car to the wife he was making a fair and equitable disposition of those assets. Depending upon the validity of appellant's claim that much of the household personalty was non-marital property, which claim was not directly addressed by the chancellor, the division may indeed have been fair and equitable. The fairness of the division, however, is irrelevant because, as § 3–6A–03(a) clearly states, "the court may not transfer the ownership of personal property from one spouse to the other." The Datsun was apparently titled in the husband's name only, but the sailboat belonged to both parties and, therefore, could not be transferred or awarded to the husband. By the same token, most of the household personalty, except items that belonged to the wife before marriage or were given to her, was apparently acquired for the use of the family after marriage. Accordingly, in the absence of evidence to the contrary, such property is presumed to have been given by the purchasing spouse to the marital unit, creating ownership by the entireties. *Bender v. Bender,* 282 Md. 525, 534, 386 A.2d 772 (1978). Such being the case, the chancellor had no authority to award it to either spouse.

### III. *Alimony*

The chancellor awarded appellant alimony for three years at a rate of $150 per week. In making that award the chancellor stated that appellant was entitled to alimony in order "to allow her the opportunity to either go back and complete her education, since she did not finish college . . . or to train herself or retrain herself for appropriate work,

*because ultimately there is no question she has to provide for herself. . . ."* (emphasis added).

 Chapter 575 of the Acts of 1980, now Md.Ann. Code art. 16, § 1, made substantial changes in basic concepts of alimony in Maryland. Formerly, when alimony was awarded, the award was for the joint lives of the parties or until the recipient remarried, subject to modification upon a subsequent material change in circumstances. It was a basic concept of alimony that a financially dependent spouse (at least one who was not at fault for the destruction of the marriage) should be able to maintain the same standard of living to which that spouse had become accustomed during the marriage, provided, of course, that the other party could afford it. *See Timanus v. Timanus,* 178 Md. 640, 642, 643, 16 A.2d 918 (1940). Under the present statute, the principal function of alimony is rehabilitation. Thus, when awarding alimony, the chancellor is required to consider not only those factors relating to the financial situation, age and health of each party, their standards of living, the duration of marriage and the contribution of each party to its well being but also the ability of the party seeking alimony to be wholly or partially self-supporting and the time deemed necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment. It is apparent, therefore, that the concept of alimony as a lifetime pension enabling the financially dependent spouse to maintain an accustomed standard of living has largely been superseded by the concept that the economically dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living.[1]

 The legislature recognized, however, that in some circumstances it may be impractical to expect a dependent

---

1. *See* The Governor's Commission on Domestic Relations Laws, Report on a Proposed Bill Relating to Alimony and Comment on a Proposed Bill Relating to the Decriminalization of Non-Support, Beverly Anne Groner, Chairman, January 18, 1980.

spouse to become self-supporting through further education or job training. Also, in some circumstances, rehabilitative alimony for a limited period of time may result in gross inequity. Article 16, § 1(c)(1) provides, in part:

The court may award alimony for an indefinite period when it finds as a fact that:

(i) the party seeking alimony, by reason of age, illness, infirmity, or disability, cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(ii) Even after the receiving party will have made as much progress toward self-support as can reasonably be expected, the respective standards of living of the two parties will be unconscionably disparate.

The chancellor articulated no findings with respect to subsection (c)(1). There is no evidence that would support an award of indefinite alimony under (i), but there is ample evidence upon which an award of indefinite alimony might have been based under (ii). The parties are the same age, thirty-nine at time of trial. When they decided to marry in 1965, the wife was in her sophomore year in college. She quit school and took a job as a teller at a savings and loan association so the husband could continue his education. She left the teller's position to take a secretarial job at the medical school because it was intellectually more stimulating and paid higher wages. Mrs. Holston had not worked since June 1967 when Dr. Holston entered the army and she moved to North Carolina where he was stationed. Their first child was born December 18, 1967.

At the time of the divorce, Dr. Holston was an assistant professor at the University of Maryland Dental School. He also practiced dentistry through a faculty practice program at the school and held numerous consulting positions. His gross income was $87,880 in 1981 and $86,343 in 1982. Mrs. Holston, on the other hand, has not been employed since June 1967. She attended Mount St. Agnes College for approximately a year-and-a-half before gaining employment

as a secretary. Her only employment experience has been as a secretary. When she left the job market in 1967, she was earning $5,000 per year as a secretary at the University of Maryland Medical School. At the time of trial, secretaries at the university were earning approximately $13,000 per year. Even if appellant, re-entering the job market after fifteen years, would be able to gain employment at a similar salary, her earnings would be less than 15 per cent those of appellee. There is nothing in the evidence to indicate that appellant would ever be able to eliminate or even substantially diminish such disparity. Assuming appellant used her three years of alimony to return to college, receive a degree and acquire a marketable skill, it is questionable whether after graduation she could earn a salary even approaching appellee's earnings. Compounding the difficulty of obtaining an education and a marketable skill is the necessity to provide and care for five minor children. Reading the record, we see no reason to expect that if alimony terminates after three years the respective standards of living of the parties would not then be "unconscionably disparate."

The permanent existence of a gross disparity in standards of living does not necessarily mandate an award of indefinite alimony. The statute provides only that upon a finding of such disparity the court *may* award alimony for an indefinite period. If the marriage has been of short duration and there was a great disparity in the standards of living prior to the marriage, it might not be unconscionable for the dependent spouse to be returned to his or her premarital standard of living. If the dependent spouse was guilty of a fault which destroyed the marriage, permitting considerable disparity in standards of living may be tolerated. But in this case the parties entered the marriage with comparable standards of living, the wife's efforts contributed greatly to the husband's career, and it was the husband's fault that destroyed the marriage.

■ In the instant case, because the evidence leaves no doubt that the award of alimony for a limited period of time will leave Mrs. Holston at the end of that period with a standard of living greatly below that enjoyed during the marriage and unconscionably disparate from the standard of living available to Dr. Holston and since the evidence discloses no factors such as fault to justify such disparity, the chancellor's failure to award indefinite alimony was a clear abuse of his discretion.

### IV. *Counsel Fees*

At the conclusion of the case, appellant's attorney submitted to the court a fourteen page petition for counsel fees, costs and expenses. The petition set forth in detail what tasks were completed, the dates on which the tasks were performed, and the time expended for each task.

At the end of the chancellor's opinion from the bench, the following colloquy took place between the chancellor and counsel for appellant:

THE COURT: The Court was pleased to see that the Petition for Attorney's Fees was an entirely reasonable petition. I commend counsel for giving the Court a reasonable figure because I am sure that many, many more hours than have been indicated had been expended on this case in preparation, was clear and evidence [sic] throughout the trial that more hours than have been billed or expended. The Court, accordingly, has no difficulty in allowing the full amount of $930.00 as a contribution to be made by the husband to the wife's attorney's fees. At the same time, the costs—

MR. HANLEY [Appellant's attorney]: Your Honor, this is going to be very—

THE COURT: Did I miss something?

MR. HANLEY: That you did. I have attached all of the bills that my client has been billed and the total amount of the bills was $5,709.50.

THE COURT: Then I missed something. I was amazed at the amount.

MR. HANLEY: I have attached all my hourly statements to it, Your Honor, as well as costs of the accountant, reporting costs, and appraisals in the body of the document, Paragraph 7, as to C and also expenses. The $5,892.70 is just attorney's fees.

THE COURT: Am I looking at it correctly?

MR. HANLEY: No. The attorney's fees were $5,709.50. The others were cost of photocopies, et cetera. Specifically set forth on Page 3 are accountant, reporting services, Your Honor, and appraisal made on the property.

THE COURT: Very well. What is the amount of the appraisal?

MR. HANLEY: The appraisal of Sam P. Rea, the personal property was $200.00; Robert V. McCurdy was the appraisal of the house—$350.00; Frederick Grell on the boat, $60.00. Do you want the costs of depositions?

THE COURT: No. Very well. I apologize for my error. I looked at the final page and did not take the time to go through the rest of the pages. The Court will allow the amount of $610.00 which represents the amount that has been given, paid or is owed to the appraisers in each instance: the $200.00 for the personal property; the $350.00 for the appraiser of the house; and $60.00 for the appraisal of the boat. Each is reasonable and appropriate, and the Court will allow that to be paid by the husband, and a contribution to be paid toward attorney's fees of $2,500.00. I will amend the original figure of $910.00 that I indicated.

In ruling upon a petition for costs and counsel fees, the chancellor must consider (a) the financial status of both parties, (b) their respective needs, and (c) whether there was substantial justification for instituting or defending the proceeding. Md.Ann.Code art. 16, § 3. The chancellor necessarily had to consider the financial status of both parties and their respective needs in his award of alimony. Since he granted the wife a divorce and ordered the husband

to pay part of her counsel fees, he obviously found that Mrs. Holston had substantial justification for instituting the suit. The statute provides that the court may order one party to pay the other a "reasonable" amount for "reasonable" and "necessary" expenses, including, *inter alia,* attorney's fees. What constitutes a reasonable amount of attorney's fees to be awarded rests in the sound discretion of the court. In *Quinn v. Quinn,* 11 Md.App. 638, 652, 276 A.2d 425 (1971), we set forth the following test:

> Counsel fees should be awarded according to the ordinary factors of labor, skill, time and benefit; and the amount of the fee cannot be wholly disassociated from the financial resources of the party charged. [citation omitted]. As stated in *Lopez v. Lopez,* 260 [206] Md. 509, 520–521 [112 A.2d 466], in determining the amount of the counsel fee to be paid by the husband to the wife's solicitor, "the court should take into consideration the financial circumstances of the parties, and determine the amount in accordance with the wife's necessities and the husband's financial ability, and allow an amount that will afford the wife an efficient presentation of her side of the controversy."

 It appears from the record that the chancellor did not read the wife's attorney's fourteen page petition for counsel fees, which described counsel's efforts on behalf of Mrs. Holston and listed the hours expended in performing those services. The court merely glanced at the last page for the "bottom line" figure. Such detail, of course, is not essential for the award of counsel fees. A chancellor may well be able to appraise the value of an attorney's services on the basis of the record and his own knowledge and experience without an account of the number of hours spent by the attorney. *Strawhorn v. Strawhorn,* 49 Md.App. 649, 659, 435 A.2d 466 (1981).

 Without having to read the entire petition, the chancellor may very well have accepted the real "bottom line" figure of $5,892.70 ($5,709.50 for a fee and the rest for expenses) as fair and reasonable in view of his own appraisal

of the value of the attorney's services. The award of $2,500.00 plus certain costs may well have been a reasoned exercise of discretion as to what portion of that reasonable charge should be borne by the husband. We cannot say, therefore, that the chancellor abused his discretion merely because he did not articulate his reasons for ordering Dr. Holston to pay only $2,500.00 of the total fee. The chancellor is presumed to know the law and to have applied it properly. *Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583 (1976). Nevertheless, since we are remanding the case for reconsideration of the monetary award, which may have some effect upon the factors of the relative financial circumstances of the parties, the wife's needs and the husband's ability to pay, we will vacate the award of counsel fees to afford the chancellor an opportunity to reexamine the amount of the award in light of any changes in the factors he considered.

DECREE AFFIRMED AS TO AWARD OF DIVORCE, CUSTODY AND VISITATION RIGHTS;

DECREE VACATED AS TO CHILD SUPPORT, MONETARY AWARD, ALIMONY AND COUNSEL FEES;

CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.