701 A.2d 1227

David Seely WITT

v.

Madonna RISTAINO.

No. 213, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Nov. 4, 1997.

Douglas B. Cording, Annapolis, for Appellant.

Thomas F. Ellis, III (Vicki Beth Wolfson, on the brief), Annapolis, for Appellee.

Argued before CATHELL, SALMON and SONNER, JJ.

CATHELL, Justice.

David Seely Witt, appellant, was granted a divorce from Madonna Ristaino, appellee, by a Judgment of Absolute Divorce entered on 29 July 1996 in the Circuit Court of Anne Arundel County. The Judgment provided, inter alia, that appellee be awarded legal custody of the parties' three minor children and that the minor children continue their education at St. Mary's, a private, Catholic elementary school, with appellant to pay all costs and tuition "if he could afford it."

Appellant subsequently filed a Motion for Reconsideration and Revision of Judgment. Appellant argued the parties had no formal agreement as to the children's attendance at St. Mary's and there was no evidence presented at trial that attendance at the private school was necessary to meet the particular educational needs of the children. A hearing on the motion was held on 6 September 1996. At the hearing, the court found "that the minor children have particular educational needs" and ordered that appellant pay sixty-five percent and the appellee pay thirty-five percent of all costs of tuition and expenses for the three minor children to attend St. Mary's. Appellant timely appealed. Appellee filed an untimely cross-appeal, which was dismissed on 16 May 1997.

## FACTS

The facts in this case are not in significant dispute. The parties were married on 2 December 1985. Three children were born during the marriage, David, Tony, and "Little Madonna," ages 9, 8, and 4, respectively. Appellee also has a fourteen-year-old son from a previous marriage, Vince, who lived with the parties while they were married.

Prior to the divorce, Tony and David were enrolled in St. Mary's of Annapolis. At the time of trial, Little Madonna was not of school age, but the parties had planned on enrolling her in kindergarten at St. Mary's the following year. Tony and David expressed to the court that they liked their school and were earning high marks of A's and B's. Testimony was given by appellee that although the children had no special educational needs, such as a learning or physical disability, she preferred they attend St. Mary's over the local public school because "they are Roman Catholic children ... [, it offers them] religion ... [and] other students ... with the same backgrounds ... both socially, and religiously." Appellant also testified that he "would rather keep them in St. Mary's if ... it's affordable." The trial court found that appellant, a private contractor in business for himself, had a monthly income of $2100, while appellee, a full-time architecture student at Catholic University, had monthly income of $650 from working part-time.[1] In accordance with the Maryland Child Support Guidelines,[2] the judge ordered appellant to pay appellee $613 per month in child support. Appellant presents three questions for our review, which we consolidate and rephrase as follows:

> I. Did the trial court err in its determination that, under the Child Support Guidelines, appellant must pay the

---

1. No alimony was requested by or awarded to either party.

2. The Child Support Guidelines are contained in Md. Code (1984, 1991, Repl. Vol., 1996 Supp.) §§ 12–201 to –204 of the Family Law Article and will hereinafter be referred to as the "Guidelines." All statutory citations refer to the Family Law Article of the Maryland Code unless specified otherwise.

costs of his minor children's private school to meet their "particular educational needs," as provided in § 12–204(i)(1), where the children did not have learning disabilities or special education needs?

II. Did the trial court abuse its discretion in ordering that appellant pay sixty-five percent and appellee pay thirty-five percent of the costs of the private school education?

## DISCUSSION

### I.

The Maryland Child Support Guidelines were enacted in 1989 by an emergency measure. Their original purpose was to "establish[ ] child support guidelines ... [which were] advisory only and g[a]ve rise to no presumption or inference" of correctness. 1989 Md. Laws, Chap. 2. Amendments to the Family Law Article later mandated the use of the Guidelines and established a "rebuttable presumption" that the application of the Guidelines yielded the correct amount of child support to be awarded. See 1990 Md. Laws, Ch. 58; see also § 12–202(a); *Petrini v. Petrini*, 336 Md. 453, 460–61, 648 A.2d 1016 (1994); *Walsh v. Walsh*, 333 Md. 492, 498, 635 A.2d 1340 (1994). The presumption can be rebutted with evidence that applying the Guidelines would render an unjust or inappropriate result in an individual case. Section § 12–202(a)(2) sets out the criteria to be used in making this determination. If the court determines "that the application of the guidelines would be unjust or inappropriate, it must make a written or oral finding on the record explaining its departure from the established guidelines." *Petrini*, 336 Md. at 461, 648 A.2d 1016 (citing *Walsh*, 333 Md. at 501–02, 635 A.2d 1340).[3]

---

**3.** Prior to the enactment of the Guidelines, child "support awards were determined by trial courts by balancing the best interests and needs of the children with their parents' financial ability to meet those needs. Other factors taken into consideration by courts in exercising their discretion were the parties station in life, their age and health, and

In the case at hand, the trial court's original order required appellant to pay $613 per month for the support and maintenance of his three minor children according to the Guidelines. In addition to this monthly support, the court ordered appellant, "unless he [was] unable to afford it," to pay the full cost of the children's private education at St. Mary's, a private, Catholic elementary school in Annapolis. There was evidence that, without school aid and with the youngest child, Little Madonna, to join her older brothers in school the following year, the total tuition and costs for all three children could reach as high as $9,000 for one year. Under the court's original order, appellant would have been responsible for the entire $9,000 in addition to appellant's support payments of about $7,000 per year.

Appellant filed a Motion for Reconsideration, contending, as he does here on appeal, that the children did not have "particular educational needs" to attend a private school and, as such, the court could not order appellant to pay the costs of the private school under 12-204(i)(1). After a hearing, the court found the children did have particular educational needs. At the hearing, the court stated:

> I'm going to find that there is a need for the children to go to the school. They've always gone to this school. It's a tradition in that family. The children went to that school before. The father wants them to go to that school, at least he wanted them to go there before. They had an agreement before the ... children were going to that school.... And so I ... think there is a particular educational need for these children.

The court then went on to discuss how the parties would divide the tuition and costs of the school:

> And what I'm going to do is ... I'm not going to go according to the income, but I'm going to make it sixty-five percent he'll pay and she pays thirty-five percent. It's

possible future educational expenses." *Petrini,* 336 Md. at 460 n.5, 648 A.2d 1016 (citation omitted).

based on taking all into consideration because of the fact that his income was twenty-five thousand dollars ($25,000) and so forth. . . . And [they will] work it way up there. They'll[4] tell us whether it's right or wrong.[5]

As a result of this order, appellant is responsible for approximately $5,850 of the $9,000 cost of his three children's attendance at St. Mary's.

This case presents an issue of first impression in Maryland. Specifically, there have been no cases interpreting the meaning of "particular educational needs" as utilized in section 12–204(i)(1). That section provides:

> By agreement of the parties or by order of court, the following expenses incurred on behalf of a child may be divided between the parents in proportion to their adjusted actual incomes:
>
> (1) any expenses for attending a special or private elementary or secondary school to meet the particular educational needs of the child.

§ 12–204(i)(1).

Appellant argues this language was intended to address children with "exceptional" or "separate and distinct needs," such as a child who has a physical or learning disability or who is in an accelerated program. Appellee, on the other hand, contends the statute should not be read so narrowly and instead asserts that the court should look at a myriad of factors of, among other things, continuity in the children's attendance and the standard of living the children enjoyed before the divorce.

---

4. We assume by "they" the trial judge meant this Court upon our appellate review of his findings, taken in context with his earlier comment of "I suggest this probably will end up at 301 Rowe Boulevard," the Courts of Appeals building.

5. Appellant, in his brief, suggested that this comment given by the trial judge indicated that he "admittedly did not know what he was doing." This Court would remind appellant that just because the attorney did not know what the judge was doing does not mean the judge did not know what he was doing.

■ In interpreting the meaning of a statute, it is a fundamental principle that we must effectuate the Legislature's intent by first reviewing the language of the statute. In *Baltimore County v. Wesley Chapel Bluemount Ass'n*, 110 Md.App. 585, 599–600, 678 A.2d 100 (1996), rev'd on other grounds, 347 Md. 125, 149, 699 A.2d 434 (1997), we summarized the rules of statutory interpretation:

The fundamental goal of statutory construction is to ascertain and effectuate the intention of the Legislature. *Oaks v. Connors*, 339 Md. 24, 35 [660 A.2d 423] (1995). The primary source for determining legislative intent is the language of the statute. *In re Douglas P.*, 333 Md. 387, 392 [635 A.2d 427] (1994); *Vest v. Giant Food Stores, Inc.*, 329 Md. 461, 466 [620 A.2d 340] (1993). We will read the statute in a natural and sensible fashion, assigning the words of the statute their ordinary and commonly understood meanings, absent evidence that the General Assembly intended a different meaning. *Board of Trustees of Maryland State Retirement and Pension Systems v. Hughes*, 340 Md. 1, 7 [664 A.2d 1250] (1995); *In re Roger S.*, 338 Md. 385, 391 [658 A.2d 696] (1995).

"[W]hen there is no ambiguity or obscurity in the language of the statute, there is no need to look elsewhere to ascertain the intent of the legislative body." *Montgomery County v. Buckman*, 333 Md. 516, 523 [636 A.2d 448] (1994). In the absence of an ambiguity, the courts " are not at liberty to disregard the natural import of words with a view towards making the statute express an intention which is different from its plain meaning.' " *Fikar v. Montgomery County*, 333 Md. 430, 434–35 [635 A.2d 977] (1994), quoting *Potter v. Bethesda Fire Department*, 309 Md. 347, 353 [524 A.2d 61] (1987). When the language of the statute is ambiguous, however, courts must look beyond the words of the statute and to other evidence of legislative intent. *Gargliano v. State*, 334 Md. 428, 438–39 [639 A.2d 675] (1994). The court should then consider, "not only the literal or usual meaning of the words, but [also] their meaning and effect in light of the setting, the objectives and purpose of

the enactment.'" *Whack v. State*, 338 Md. 665, 672 [659 A.2d 1347] (1995), quoting *Gargliano*, 334 Md. at 436 [639 A.2d 675]. We may thus "consider the consequences resulting from one meaning, rather than another, and adopt the construction which promotes the most reasonable result in light of" the statute's purpose. *Rucker v. Comptroller of the Treasury*, 315 Md. 559, 565 [555 A.2d 1060] (1989). In all cases, however, "[c]are must be taken to avoid construing a statute by forced or subtle interpretations." *Houston v. Safeway Stores, Inc.*, 109 Md.App. 177, 184 [674 A.2d 87] (1996)[,rev'd on other grounds, 346 Md. 503, 697 A.2d 851 (1997)].

In the case at hand, the parties disagree as to the meaning of "particular educational needs of the child" as used in the Child Support Guidelines. As we have noted, there are no Maryland cases interpreting this portion of the Guidelines. In applying the rules of statutory construction, we look to the language of the statute itself for aid in interpretation. There are no statutory definitions, however, to assist in determining the meaning, and in no other sections of the statute is this phrase used. Furthermore, there is no plain or clear meaning to these words in that they are subject to multiple interpretations. Correctly focusing on the meaning of the word "particular," appellant points out that the dictionary defines "particular" with words such as "special rather than general" and "distinguished or different from others or from the ordinary." RANDOM HOUSE DICTIONARY 1052 (1983). From this appellant gleans that because a private school offers the same mandatory instructional guidelines and curricula as public schools and the children have no learning, emotional, or physical disabilities, the statute does not contemplate ordering him to pay for their attendance at a private parochial school when a public school adequately will meet their general, as opposed to particular, educational needs.[6] The dictionary definition of

---

6. We acknowledge a presumption which favors Maryland public schools and make no opinion as to the general quality of private schools over public. There was no dispute in this case that the local public

"particular," however, also can be used to support the argument that private schools do meet "special" or "other than general" needs of children because of a religious atmosphere, sometimes smaller class sizes, or other unique characteristics. Just because a child's educational needs do not include a disability does not necessarily mean his or her needs are not "particular."

Because the plain meaning of § 12–204(i) is ambiguous, we must look to other sources for aid in interpretation. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628 (1987). As both parties note, the legislative history surrounding the Child Support Guidelines yields no assistance in interpreting this provision. An exploration of Maryland opinions written before the passage of the Guidelines, however, gives us some general guidance in this area.

In *O'Connor v. O'Connor,* 22 Md.App. 519, 323 A.2d 632 (1974), the father appealed from a modification increasing his child support obligations where some of the increase was to pay for the parochial school education of the parties' children. The father raised no objection at trial to the children's attendance at the school but objected to paying for the education. Holding for the mother, we said "the law in a child support case is always what is in the best interest of the child, i.e., the needs of the child in view of the child's station in life, tempered only by the financial ability of the parents to provide the requisites of the child." *Id.* at 522, 323 A.2d 632. We went on to hold:

> While we do not endeavor at this time to formulate any general rule or principle regarding the responsibility of a father to provide his child or children with an education in the private secondary school sector . . . ,we believe that in the factual posture of this case, the chancellor below was not clearly erroneous in increasing the support payments for the minor children, knowing that a part of those funds

school, which the children could have attended if not enrolled in St. Mary's, is a fine institution.

would be expended to finance the education of the parties' minor children in parochial schools.

Both the father and the two older children had gone to secondary parochial schools. At the time the divorce proceedings were instituted, Gary had been enrolled at St. John's and the younger children were attending elementary parochial schools. The mother testified that she wanted the boys to attend St. John's in part because it was a military school under the direction of men and she desired the boys to have this atmosphere because their father was not at home to supervise and discipline them. She concluded by stating that she was simply following the pattern of education for the children which had been pursued for years during the time she and her husband were married. We think these are salutary reasons which have been advanced by the mother and demonstrate an intelligent concern for the welfare and educational needs of the children.

The obvious financial ability of the father to pay for his childrens' [sic] private schooling, the pattern of education which had been set for the children prior to the divorce, the station in society occupied by the parties and the educational needs of the children create a set of circumstances, when considered in their totality, which clearly justify, in our opinion, the increased child support payments ordered by the chancellor.

*Id.* at 525–26, 323 A.2d 632 (citation omitted)(footnote omitted).

Another pre-Guidelines case, *Holston v. Holston,* 58 Md. App. 308, 473 A.2d 459 (1984), dealt with the same issue of whether a trial court could award as a part of child support obligations the cost of private school education for the divorced parties' minor children. In that opinion, we specifically rejected using the factors set out in *O'Connor* as a rigid test. Rather, we stated, *"O'Connor* ... presented certain factors which are permissible considerations in ruling on the issue of child support." *Id.* at 316, 473 A.2d 459. Furthermore, "[t]he proper inquiry ... is what is in the best interest of the child. In reaching that conclusion, the chancellor must balance the

needs of the child against the parent's financial ability to meet those needs." *Id.* at 317, 473 A.2d 459. Accordingly, when considering the matter of public or private education before the Guidelines were in place, the paramount concern was the "best interests of the child."

In addition to the pre-Guidelines cases, another helpful area in reviewing this statute is a brief survey of cases interpreting similar provisions from other states. Twenty-seven states, including Maryland, use the Income Shares Model in determining child support responsibilities. Barbara R. Bergmann & Sherry Wetchler, Child Support Awards: State Guidelines vs. Public Opinion, 29 FAM. L.Q. 483, 485 (1995)(surveying the discrepancies between what the Maryland Child Support Guidelines actually award and what the Maryland public feels is appropriate). Two states, Colorado and Louisiana, have enacted statutes similar to Maryland's with language closely resembling the provision at issue.[7] Both states have cases reviewing their respective provision.

Colorado opinions evaluate facts and issues similar to those evident in the case sub judice. In *In re Marriage of Payan,* 890 P.2d 264 (Colo.Ct.App.1995), the trial court determined the cost of sending the parties' two minor children to a private school should not be included in the father's child support obligations because "there was no evidence that the children

---

7. Colorado's statute reads in pertinent part:

    (13) **Extraordinary adjustments to schedule.** (a) By agreement of the parties or by order of court, the following reasonable and necessary expenses incurred on behalf of the child shall be divided between the parents in proportion to their adjusted gross income:

    (I) Any expenses for attending any special or private elementary or secondary schools to meet the particular needs of the child.

COLO. REV. STAT. ANN. § 14–10–115(13)(a) (West 1989 & Supp. 1996).

    Louisiana's statute reads, also in pertinent part:

    By agreement of the parties or order of the court, the following expenses incurred on behalf of the child may be added to the basic child support obligation:

    (1) Any expenses for attending a special or private elementary or secondary school to meet the particular educational needs of the child.

LA. REV. STAT. ANN. § 9:315.6(1) (West 1991).

had a learning disability or other special need which makes private school education required.'" *Id.* at 265. Reversing the trial court, the Colorado Court of Appeals held this interpretation of "particular educational needs" was too narrow. Instead, the court said the trial court should

consider, when calculating child support, the standard of living the child would have enjoyed had the marriage not been dissolved. In this context, the means of meeting the "particular educational needs" of a child are not limited to providing private schooling only when a child has a learning disability or otherwise qualifies for a program of special education.

Here, the record indicates that both children had been attending the private school for a number of years before the dissolution of the marriage. That factor may properly be considered by the trial court in determining whether continuing enrollment at the school therefore meets the children's particular educational needs.

*Id.* More recent Colorado cases continue in this interpretation. See *In re Marriage of Elmer,* 936 P.2d 617, 622 (Colo.Ct.App. 1997)("The means of meeting the particular educational needs' of a child are not limited to providing private schooling only when a child has a learning disability or otherwise qualifies for a program of special education. Rather, the standard of living that the child would have enjoyed if the marriage had not been dissolved must be considered."); *In re Marriage of Eaton,* 894 P.2d 56, 59 (Colo.Ct.App.1995)("The particular educational needs of the child' are not to be construed narrowly as only encompassing learning disabilities. Rather, child support may include an amount to allow a child to attend private school if circumstances warrant.").

Louisiana has reviewed its analogous statute and interpreted "particular educational needs" a number of times with an outcome similar to that of Colorado. In a recent case, a father appealed the trial court's ruling which ordered him to pay eighty-five percent of the tuition for the private school of the parties' children, claiming there had been no showing of particular educational need requiring the children attend that

school. *Valure v. Valure,* 696 So.2d 685, 687 (La.Ct.App.1997). The trial court noted evidence that the father had never objected to the children's attendance and continued to pay for the costs and tuition after he and his ex-wife had separated. The trial court also found that the children had always attended the private school and because of the trauma of their parent's divorce, the children were undergoing a great deal of stress and needed a sense of stability in their lives. Holding for the mother, the appellate court concluded:

> A particular educational need of a child to remain in private school includes consideration of the child's history of attending a private school and whether a continuation of the child's education in that setting is in the child's best interest. A child's successful continuation of his or her education in a proven academic environment is generally found to be in his or her best interests.

*Id.* at 688 (emphasis added) (citations omitted). Other Louisiana cases hold likewise. See *Buchert v. Buchert,* 642 So.2d 300 (La.Ct.App.1994) (explaining that "particular educational needs" includes considering a child's history of attendance at the private school, whether continuing would be in their best interests, which can be demonstrated by academic success, and whether the parties had previously chosen to send their children to a private school); *Jones v. Jones,* 628 So.2d 1304 (La.Ct.App.1993)(holding the trial court properly included private school expenses in husband's child support obligation where the children had been attending private school and the husband admitted that he would prefer his children attend private school if he could afford it).

From our review of Maryland cases prior to the enactment of the Child Support Guidelines and of cases from other jurisdictions interpreting a similar statutory provision, it is clear the law in Maryland prior to the Guidelines can be reconciled with the new statutory language. Prior to the Guidelines, we declined to give a hard and fast rule for determining whether a non-custodial parent should be obligated to pay for his or her children's private school education. Rather, we noted, trial courts should evaluate various factors

on a case-by-case basis, taking into consideration the best interests of the child "tempered only by the financial ability of the parents" to pay for the education. *O'Connor,* 22 Md.App. at 522, 323 A.2d 632; accord *Holston,* 58 Md.App. at 308, 473 A.2d 459. In *O'Connor,* for instance, we considered such factors as the children's history of education, their "station in society," as well as their educational needs. *O'Connor,* 22 Md.App. at 525–26, 323 A.2d 632. Although these cases were not rejected by the Legislature when it enacted the Guidelines, we realize that we must give the trial courts further guidance in interpreting what are a child's "particular educational needs."

We decline to interpret section 12–204(i)(1) under the narrow view, as advocated by appellant, that in order for a trial court to order that special or private educational expenses for the child be considered as support subject to the Guideline considerations, the child must be laboring under some sort of disability or high ability. This interpretation would render too strict a standard for parents whose children have special needs but are by all other accounts normal or average students. Further, the law in Maryland child support cases has always been what is in the best interests of the child. *O'Connor,* 22 Md.App. at 522, 323 A.2d 632. The Child Support Guidelines do not abrogate this doctrine but, rather, reinforce it. See § 12–202(a)(2)(iv)(2)(C)(the trial court, in departing from the presumptive correctness of the Guidelines because their application would be unjust in a particular case, must make written findings as to why the deviation "serves the best interests of the child"). It would be nonsensical to allow a child to remain in a special or private school after the parents' separation only if he or she qualifies for "special education" services. To state it another way, a trial court should consider whether to attend or remain in a special or private school is in a child's best interest and whether and how parents are required to contribute to that expense.

█ Accordingly, we hold that the trial courts should consider this non-exhaustive list of factors when determining

whether a child has a "particular educational need" to attend a special or private elementary or secondary school. First, courts should consider the child's educational history, such as the number of years the child has been in attendance at that particular school. While we give no minimum of time to consider, it seems evident that a child who has attended a private school for a number of years may have a more compelling interest in remaining in that school than a child who has yet to begin his or her education at the private institution. Further, as part of the history factor, courts should evaluate the child's need for stability and continuity during the difficult time of the parents' separation and divorce. This factor also contemplates the premise of the Income Shares Model that "the child should receive the same proportion of parental income he or she would receive if the parents lived together." Senate Judicial Proceedings Committee, Floor Report, Senate Bill 49 (1989).

Second, courts should look at the child's performance while in the private school. It is often in a child's best interest to remain in a school in which she or he has been successful academically. Third, courts should consider family history. That is, a court should look at whether the family has a tradition of attending a particular school or whether there are other family members currently attending the school. Part of this consideration can include a review of the family's religious background and its importance to the family unit, if the private school is a religiously-oriented institution.

Fourth, courts should consider whether the parents had made the choice to send the child to the school prior to their divorce. Although the statute provides that expenses of a special or private school may be divided "[b]y agreement of the parties or by order of court," § 12-204(i)(emphasis added), often there is no express agreement as to the child's schooling. Consideration should be given, however, to the prior decision and choice of the parents to send the children to a private institution as the intent of the parties before the separation is instructive.

Fifth, courts should consider any particular factor that may exist in a specific case that might impact upon the child's best interests.

Finally, courts must take into consideration the parents' ability to pay for the schooling. While not the primary factor, it is vital for a court to consider whether a parent's financial obligation would impair significantly his or her ability to support himself or herself as well as support the child when the child is in his or her care.

■■ In the case sub judice, the trial court made findings similar to those which we set forth today. During the hearing on the Motion for Reconsideration, the judge elicited factors he found compelling in considering whether the children had a particular educational need to remain at St. Mary's. He found there was a history of attendance because the two older children always had attended the school. He found there was a family tradition of attending the school as there was evidence that many of the children's cousins were also attending St. Mary's. The parents had agreed upon sending the children there before the divorce and even after the separation with appellant paying the costs. Although there was no express agreement between the parties under § 12–204(i), there was a tacit agreement and a mutual choice by the parties at one time. Beyond these findings, the testimony supports other factors, such as David's and Tony's academic success at St. Mary's and appellee's assertion that she wanted them to attend the school because they were "Roman Catholic children." What may be problematic is Little Madonna's status. As a four-year-old about to begin kindergarten, she had no history of attendance or history of success at St. Mary's. The trial court, however, in determining custody matters in respect to Little Madonna, stated: "I certainly am not going to split these children up, that's for sure." The trial court similarly and consistently resolved the school situation. He initially noted that the children were "being raised Catholic." He then stated, "the children [all of them] should go to St. Mary's. . . . I still believe the children should go to St.

Mary's...." In analyzing the factors, it is clear the trial court could have found she had a particular educational need to attend the same school as her older brothers as it may be traumatic for a young child to be separated from her siblings at that young age. It is in the trial court's discretion to determine this. For the foregoing reasons, these factors properly helped the judge conclude that the children had a particular educational need to attend the private school.

Another factor, which appellant argues may not properly have been considered, is affordability. While we address this issue in more detail in part II of this opinion, we note here that the trial court properly considered this factor and determined, in his discretion, that appellant could afford to pay a percentage of the private school expenses.

## II.

We now turn to the issue of whether the trial court abused its discretion in ordering appellant to pay sixty-five percent and appellee to pay thirty-five percent of the costs of the private school education pursuant to appellant's Motion for Reconsideration. Section 12–204(i) provides in pertinent part that "the following expenses incurred on behalf of a child [for attending a special or private school] **may** be divided between the parents in proportion to their adjusted actual incomes." (Emphasis added.) In interpreting this provision, we take note that under the canons of statutory construction, we must first review the text of the statute according to its "plain and ordinary meaning when those words are not ambiguous." *County Council v. Supervisor of Assessments*, 274 Md. 116, 120, 332 A.2d 897 (1975). In reviewing the words "shall" and "may," we are reminded that

> [t]he word "shall" in a statute is "presumed mandatory on the parties, denoting an imperative obligation inconsistent with the exercise of discretion." Unless the context indicates otherwise, "shall" and "must" will be construed synonymously "to foreclose discretion" and "impose a positive absolute duty."

*Columbia Road Citizens' Ass'n v. Montgomery County,* 98 Md.App. 695, 700, 635 A.2d 30 (1994)(quoting *Robinson v. Pleet,* 76 Md.App. 173, 182, 544 A.2d 1 (1988)). Cf. *Director v. Cash,* 269 Md. 331, 344, 305 A.2d 833 (1973), cert. denied, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974).

The word "may" in section 12–204(i) connotes that a trial court can, in its discretion, divide the expenses of special or private education between the parents according to and in proportion with their adjusted actual incomes. This interpretation is supported by the fact that in the preceding subsections of section 12–204 dealing with expenses to be shared by the parents, the legislature used the word "shall" in directing the courts to divide the costs of certain support obligations proportionately between the parents, in accordance with their adjusted actual incomes. See § 12–204(g)(child care expenses "**shall** be added to the basic obligations and shall be divided between the parents in proportion to their adjusted actual incomes") (emphasis added); § 12–204(h) (extraordinary medical expenses of the child "shall be added to the basic obligations and **shall** be divided between the parents in proportion to their adjusted actual incomes") (emphasis added). Moreover, in *Krikstan v. Krikstan,* 90 Md.App. 462, 471, 601 A.2d 1127 (1992), we reviewed section 12–204(g)(2) of the Family Law Article and stated that " [s]hall' generally denotes an imperative obligation inconsistent with the idea of discretion."

While appellant argues the costs and tuition simply are not affordable even after the judge apportioned the expenses with sixty-five percent to appellant and thirty-five percent to appellee, appellee asserts the trial court erred by not ordering the costs in proportion to the parties' adjusted actual incomes.[8] If the court ordered the parties to pay using proportionate shares calculations, appellant would be required to pay for

---

**8.** According to the record, the court found that appellant's yearly income was $25,200 and appellee's was $7,800. Accordingly, appellant's proportionate share of the parties' total income of $33,000 was about seventy-six percent, while appellee's share was about twenty-four percent.

seventy-six percent of the costs for St. Mary's while appellee would pay only twenty-four percent. As we have indicated, however, appellee's cross-appeal was untimely filed and has been dismissed. Accordingly, her request that we vacate the trial court's apportionment of the school expenses and direct it to increase appellant's share of the costs is not before us. The only issue before us is appellant's contention that his share should be decreased.

■ We shall consider, however, appellee's argument as it relates to the issue presented to us by appellant. The cornerstone of appellee's argument is that "[w]hile the awarding of private school expenses is discretionary . . . the proportionate share of each parent is not." Appellee concludes that any other interpretation would be in contravention to the goals of the Guidelines. In light of the comparison of the statutory language in § 12–204(i) with § 12–204(g) & (h), we disagree with appellee. We assume the Legislature carefully selected its wording and was aware of the directory word "shall," used in the latter subsections, and the discretionary word "may," used in the former subsection. While allocating the cost proportionately may be appropriate in many cases, it is conceivable that a division other than proportionate to the parties' income may be appropriate under some circumstances. This determination is within the discretion of the trial judge.

While not specifically listing each and every factor he considered in rendering his decision, the trial and hearing transcripts reflect the court's considerations and findings as to the particular educational needs of the children, the affordability of the tuition, and the appropriate division of the tuition between the parties. In delivering his oral order, the judge stated:

> If [the costs and tuition of St. Mary's is] going to be eight hundred dollars, I don't know whether [appellant is] going to be able to afford it, unless [appellee] wants to supplement it in some way. I think you should do your best efforts to get to St. Mary's. I'm going to order that it be St. Mary's,

unless he can show that he is unable to afford it. I mean, you ought to start working on it now.

At the hearing on appellant's Motion for Reconsideration, the court also evaluated the affordability of St. Mary's for both parties and the division of expenses:

THE COURT: I thought [appellee] didn't have much of an income.

[APPELLANT'S ATTORNEY]: She didn't have much, but I think the Court found that she did have the ability to make six or seven thousand dollars a year, and apportioned for purposes of the Guidelines some income to her....

. . . .

THE COURT: And their [the minor children's] grandparents are probably paying for [St. Mary's].

[APPELLEE'S ATTORNEY]: You got it. As we stand here the grandparents are paying it, and that ain't fair . . . .

. . . .

[APPELLANT'S ATTORNEY]: [Appellant] is now paying in excess of seven thousand dollars ($7,000) child support. It's about seventy-three, seventy-four hundred dollars($7,400).... It's six hundred and thirteen dollars ($613) a month.... If the Court were to impose this educational burden on him of eight or nine thousand dollars, [appellee's attorney] says seven, there are three children

THE COURT: Well, [appellee] would pay her portion.

[APPELLANT'S ATTORNEY]: Well, that would certainly... lessen the impact on [appellant], but her portion is maybe a quarter of what his income would be, if it were apportioned ... he'll be paying out more than half of his gross income in support ... to the children, either by way of child support or to meet these educational burdens that will be placed on him....

. . . .

[APPELLEE'S ATTORNEY]: I wasn't going to get into affordability, but ... [n]umber one, under fourteen of the Judgment of Divorce there was thirty thousand dollars

($30,000) in money at Farmer's National Bank. [Appellant] got fifty three percent of it. That should definitely take care of his share of seven thousand dollars ($7,000). She got the rest of it, whatever forty-seven percent.... Two, he doesn't have a mortgage on his house. And ... three, it's a fact that [the children] are [at St. Mary's] right now....

. . . .

[APPELLEE'S ATTORNEY]: ... [As to w]hether it's still affordable after the separation ... I say it's affordable this year because of the split of the monies.

Part and parcel of the court's affordability considerations was the ability of the parties to secure financial assistance for St. Mary's tuition and costs. At trial, both parties testified to the effect that they had applied for and obtained financial assistance and scholarships for the children in the past, based in part on the family's need and the children's grades.

[APPELLANT'S ATTORNEY]: ... [Appellant] did pay for their [the children's] school, did he not?

. . . .

[APPELLEE]: Yes, he paid for it in addition to the grants that he got from the parish—

[APPELLANT'S ATTORNEY]: Okay, and—

[APPELLEE]: —that was a fifty-percent grant.

. . . .

[APPELLEE'S ATTORNEY]: —which place are they going to go, and who's going to babysit?

[APPELLANT]: Preferably St. Mary's.

[APPELLEE'S ATTORNEY]: Okay.

[APPELLANT]: There's after-school care provided—

[APPELLEE'S ATTORNEY]: How much is it?

[APPELLANT]: This past year, because we had grant money, it was two sixty-seven per month.

[APPELLEE'S ATTORNEY]: How much would [that] be now?

[APPELLANT]: That's for two [children]. Next year, if we could, again, get some grant money, it would be approximately four hundred a month, if not . . . if I take and just look at their tuition schedule, it could go up to eight hundred a month.

[APPELLEE'S ATTORNEY]: That's for after-school care?

[APPELLANT]: No, that's tuition.

[APPELLEE'S ATTORNEY]: That's—I said, how much is after-school care?

[APPELLANT]: Oh . . ., they pay—by the hour, I think it's two-seventy-five ($2.75) an[ ] hour.

. . . .

[APPELLEE'S ATTORNEY]: And then we have tuition at how much? Eight hundred dollars for the three kids?

[APPELLANT]: Or four hundred [with the scholarships], I mean, you know—

[APPELLEE'S ATTORNEY]: Well, let's take four hundred?

[APPELLANT]: Okay.

[APPELLEE'S ATTORNEY]: This year, how much was it?

[APPELLANT]: Two-sixty seven per month.

[APPELLEE'S ATTORNEY]: Okay. And you add another kid to it, it's four hundred plus two-fifty [equals] six-fifty; how are you going to do that on [your income]?

[APPELLANT]: The same way I've been paying for it all along, I'm frugal with money, I'm very responsible with money and I don't waste money, and I do what I have to do to take care of my kids.

In its order at the conclusion of the trial, the judge noted with regards to appellant paying for St. Mary's:

[T]he children should go to St. Mary's. Now, I—look, if he finds that he's down and out, and can't do it, I think they'll make every effort to get a grant for these children, I think they're going to get a better education. . . .

. . . .

If it's going to be eight hundred dollars, I don't know whether he's going to be able to afford it, unless she wants to supplement it in some way. I think you should do your best efforts to get to St. Mary's.

This testimony and the judge's comments indicate that the parties can make it more affordable to send their children to St. Mary's. The parties applied for and received substantial financial assistance in the past and, for some reason, failed to apply for it that upcoming school year. At the reconsideration hearing, the court asked:

THE COURT: And no help at St. Mary's? They won't help him in any way?

[APPELLANT'S ATTORNEY]: There are grants and there [is] other financial assistance available, but the—

THE COURT: They weren't entitled?

[APPELLANT'S ATTORNEY]: . . . the parties do not communicate to the extent where anybody has been responsible enough to obtain the scholarships, grants and so on and so forth.

It seems clear from past experience that the parties will qualify for substantial financial assistance from St. Mary's, but the parties must seek that financial assistance. It is within the power of appellant as well as appellee to help defray the costs of tuition simply by making an effort. Indeed, it would be in the best interests of all parties involved, especially the children, to do so. The court obviously considered the financial assistance factor, or at least the opportunity to receive financial assistance, in determining whether the cost of the children's private education was affordable. This was proper.

Finally, the court then stated: "I'm going to make it sixty-five percent he'll pay and she pays thirty-five percent. It's based on taking all into consideration because of the fact that his income was twenty-five thousand dollars ($25,000) and so

forth." [9] (Emphasis added.) It is clear the trial judge considered all the information he had before him in making his determinations. Thus, it was reasonable for the judge to conclude that, by dividing the costs of the children's private school tuition in the manner he did, the costs were affordable for appellant.

We hold that the trial judge did not abuse his discretion in apportioning the expenses of St. Mary's in a sixty-five percent—thirty-five percent manner. We further hold the trial judge did not err in its determination that appellant could afford the expenses of private school tuition.[10]

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**

---

9. As appellee noted, this is less than the proportionate share based upon the adjusted gross income of the parties.

10. When "Little Madonna" joins her brothers in the parochial school, appellant will be obliged to pay approximately $5,840—65% of the estimated cost of $9,000. His total contribution to his three children will be $12,850 annually, $5,850 + $7,000. His income was found to be at least $25,200. There was evidence that his home was paid for. He owns his own contracting business. He received a substantial sum from a joint account funded by the sale of the parties property. There is nothing in the joint record extract indicating that appellant has any other substantial financial obligations such as loans.