806 A.2d 716

Jeffrey C. FUGE

v.

Susan M. FUGE.

No. 1127, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 4, 2002.

James G. Nolan (Witt & Nolan L.L.P., on the brief), Washington, D.C., for appellant.

Allen J. Kruger (Elizabeth A. Proctor, on the brief), Laurel, for appellee.

ADKINS, BARBERA, and RAYMOND G., THIEME, JR., (Retired, Specially Assigned), JJ.

ADKINS, J.,

In these cross-appeals, we again are asked to resolve legal issues stemming from the 1998 divorce of Jeffrey and Susan Fuge. The Circuit Court for Montgomery County granted the Fuges a judgment of absolute divorce on June 11, 1998. This is the third appeal concerning divorce-related issues. Upon reviewing the case for a third time on remand, the circuit court entered a monetary award in favor of Ms. Fuge, holding that Maryland Code (1984, 1999 Repl. Vol.), section 8-201(e)(2) of the Family Law Article ("FL") was not applicable to a marital home, which had been held by the Fuges as tenants by the entirety during their marriage, but sold before their divorce. The court also ruled that Mr. Fuge was not obligated to pay any portion of the Fuge children's private school tuition. It is from this decision that the parties note their respective appeals.

Mr. Fuge, appellant/cross-appellee, raises two questions for our review.

I. Did the trial court err when it ruled that FL section 8-201(e)(2) does not apply to real property held by the parties as tenants by the entirety during their marriage, but sold before the divorce?

II. Did the trial court err when, in determining the monetary award, it looked to the parties' respective economic circumstances on the date of the divorce in 1998 rather than on the date that the monetary award was entered in 2001?

Ms. Fuge, appellee/cross-appellant, puts forth an additional issue in her cross-appeal.

III. Did the trial court err in determining that Mr. Fuge did not have to contribute toward private schooling for

the Fuge children, after making an express finding that such schooling was appropriate?

We hold that the trial court properly found that FL section 8-201(e)(2) did not apply to the Fuge's former property. We find error, however, in the court's failure to reevaluate the parties' economic circumstances in 2001, upon its recalculation of the original 1998 monetary award in response to our decision in the second appeal. The court committed further error in basing its conclusion that Mr. Fuge had no obligation to contribute to his children's private school tuition on a clearly erroneous factual finding that Mr. Fuge lacked the **ability** to do so. We therefore remand the case in order for the trial court to reconsider issues II and III in accordance with our opinion.

## FACTS AND LEGAL PROCEEDINGS

Because of the lengthy history of this case before this Court, and the extensive record, we have chosen to restate substantial portions of the facts from our opinion in the second appeal in this case.

### Relatively Undisputed Facts

The Fuges were married on October 29, 1977, and produced three children. In 1979, the Fuges acquired a home at 3902 Woodbine Street, Chevy Chase, Maryland ("the Woodbine property"). The sum of $179,000 that was needed to purchase the Woodbine property was provided by Mr. Manfuso, Ms. Fuge's father. Mr. Fuge was the only party to attend the November 26, 1979 settlement, and the Woodbine property was titled in the names of both parties, as tenants by the entirety. In 1983, the parties constructed an addition to the Woodbine property, and Mr. Manfuso again provided the necessary funds, about $30,000.

On August 29, 1986, the parties sold the Woodbine property and received net proceeds of $340,610.67. They then moved into a house located at 8315 Kerry Road, Chevy Chase, Maryland, which had been previously purchased by Mr. Man-

fuso, including an adjoining lot with an address of 8317 Kerry Road, Chevy Chase, Maryland, and was given by Mr. Manfuso to Ms. Fuge by an accommodation deed. The parties constructed a house on the 8317 Kerry Road property, but continued to reside at the 8315 Kerry Road property rent-free during the construction of the 8317 Kerry Road property. The total cost of constructing the 8317 Kerry Road property amounted to $526,992.00. The parties moved into the 8317 Kerry Road house in December 1988, with the property titled solely in Ms. Fuge's name.

## The Disputed Facts

The parties separated in August of 1995. At trial, the main issue before the court was whether the $340,610.67 received from the sale of the Woodbine property was marital property or Ms. Fuge's sole property. Because the evidence surrounding these transactions conflicted at trial, we will summarize the testimony of Ms. Fuge, Mr. Manfuso, and Mr. Fuge, as they relate to these transactions.

Concerning the money used for the purchase of the Woodbine property, Ms. Fuge testified at trial that the money had been loaned to her by Mr. Manfuso to cover both the purchase of the Woodbine property and the closing costs. Ms. Fuge also said that no marital funds had been used in that transaction. Not only was the loan from Mr. Manfuso evidenced by a demand promissory note for $179,000.00, dated December 20, 1979, and payable to Mr. Manfuso, the promissory note was signed only by Ms. Fuge. Concerning the construction of the addition, she alone executed a promissory note for $30,302.02 on January 24, 1983, payable to Mr. Manfuso. These were the only funds used in constructing the addition.

Concerning repayment of the loans, Ms. Fuge testified that in 1984, the two loans, totaling approximately $209,000, were forgiven by Mr. Manfuso. Not only had no payments been made on either note, Mr. Fuge was not a party to either note nor was his name mentioned in the "Acknowledgment of Gift" forgiving the loans. In addition, Ms. Fuge contended that Mr.

Manfuso had never intended for Mr. Fuge to receive any of those funds, and had given them solely to her.

After the sale of the Woodbine property, Ms. Fuge placed the net proceeds from the sale into a Franklin Fund account solely in her name ("the Franklin Fund"). By the end of 1986, the Franklin Fund contained $580,000. Ms. Fuge testified that all of the money used in the construction of the 8317 Kerry Road property had been obtained from the Franklin Fund.

At trial, Mr. Manfuso testified that he had made the check for $179,000 to purchase the Woodbine property payable only to Ms. Fuge, because prior to estate planning he and his wife had decided to give Ms. Fuge an interest-free loan to purchase a home. Mr. Manfuso also recalled having made clear to both parties that any gifts and/or funds provided by him were to remain only in Ms. Fuge's name, and that he had intended the funds used for the purchase of the Woodbine property to be a gift only to Ms. Fuge. As for the $30,000 interest-free loan used for constructing an addition to the Woodbine property, Mr. Manfuso said that those funds had been given solely to Ms. Fuge.

Mr. Fuge testified that the sum of $179,000 needed to acquire the Woodbine property had been a gift to both parties from Mr. Manfuso. Before purchasing the Woodbine property, Mr. Manfuso had said, " 'Kids, I want you to go out and start looking for a house, and I will be helping you.' " After they had decided to purchase the Woodbine property, Mr. Manfuso said, " 'You two are very lucky in that I am giving you a gift to buy your first home.' " Mr. Fuge said they had discussed purchasing the Woodbine property, and Ms. Fuge had commented on how wonderful it was that Mr. Manfuso was " 'helping [them] to get into this home, the two of us.' "

Mr. Fuge testified that he had attended settlement on the Woodbine property and that Mr. Manfuso's check had been deposited into the parties' joint bank account, but he could not recall to whom the check was made payable. Regarding construction of the addition, Mr. Fuge testified that the funds used to construct the addition to the Woodbine property had

been a gift to the parties from Mr. Manfuso. Mr. Fuge also testified that Mr. Manfuso had never indicated that the addition of the Woodbine property was to be a gift only to Ms. Fuge, and that the conversations he had had with Ms. Fuge concerning construction of the addition consisted of their comments that they were both very lucky to have Mr. Manfuso giving them this gift.

Upon sale of the Woodbine property, Mr. Fuge testified that he and Ms. Fuge decided to place the net proceeds in an interest bearing account to be used for the construction of a new house, and confirmed that the Woodbine property had been titled in both their names as tenants by the entirety.

On May 21, 1998, at the close of evidence, the trial court found that the lot upon which the 8317 Kerry Road property was built was non-marital property, as it had been a gift from Mr. Manfuso solely to his daughter, Ms. Fuge. In addition, the trial court found that monies in the Franklin Fund in excess of the $340,000 received from the sale of the Woodbine property were funds belonging solely to Ms. Fuge, as gifts from her parents. Moreover, those funds, plus the net proceeds received from the sale of the Woodbine property, were used to construct the 8317 Kerry Road property. The trial court took under advisement the issue of whether FL section 8-201(e)(2) applied to the Woodbine property.

On June 10, 1998, the trial court ruled from the bench:

On May 21st I decided all issues with the exception of the property at [Kerry Road] in Woodbine. I took the case under advisement because of the issue regarding how.... [FL 8-201] applied to this case.... I have decided this issue on other facts and the facts that I find are that [Ms.] Fuge's father, Mr. [Manfuso], made a gift to both Mr. and [Ms.] Fuge of the funds needed to purchase the property on Woodbine November 26th, 1979.... When the Woodbine property was sold in August of 1986[,] $340,611 proceeds of the sale were placed into an account in [Ms.] Fuge's sole name. Other non-marital monies were put into that account.

The cost of construction of the home on [Kerry Road] was $526,992. The marital property, $340,611, was used in its entirety towards the cost of construction on [Kerry Road] and it represented .... 64.4 percent of the cost to construct the home on [Kerry Road].

The evidence at trial was that the value of the property at [Kerry Road] totaled $860,000, of which $275,000 was for the land. The land is clearly non-marital property and titled to [Ms.] Fuge....

[T]here is no evidence in this record that the title to the Woodbine property was recorded by mistake. The evidence is that the title to the Woodbine property was in the joint names of Mr. and [Ms.] Fuge as tenants by the entirety.

Further, there is no evidence that during the time that the parties lived in Woodbine that it was to be treated in any way other than jointly owned marital property.

After the sale of the property the evidence is that [Ms.] Fuge told [Mr. Fuge] that her father wanted [the Kerry Road] property to be in her name only.

Jeffrey's testimony and evidence presented was that he was reluctant to agree to not have his name on the property but his wife reassured him or assured him notwithstanding the fact that it was her father's idea the property was jointly, was still to be half owned by each of them.

Further, I accept the testimony of [Mr. Fuge] that he and his wife agreed to put the proceeds from Woodbine into [Ms.] Fuge's account and that they further agreed that the money would be used to build a new home.... There is no evidence it was done by mistake.

There is evidence that a subsequent piece of property was incorrectly titled in both Mr. and [Ms.] Fuge's names and it was immediately changed to [Ms. Fuge's] sole name.

Further, I accept the testimony of [Mr. Fuge] that another reason he was reluctant to agree to putting the property in his wife's sole name was because he didn't have any retirement and he expressed that to his wife, who told him that he need not worry, that she would inherit millions of

dollars and that if he just continued to pay the bills he would be taken care of when she inherited from her mother and father.

It was his testimony and credible testimony that he consented because he trusted his wife, that there were several conversations between he and his wife on this matter.

So as a result of all the evidence, I am signing a judgment of absolute divorce . . . .

The real property, as indicated before, on [Kerry Road] is determined to be marital property to the extent of $378,151.

A monetary award is granted in favor of [Mr. Fuge] against [Ms. Fuge] in the amount of $141,510 as an adjustment of the equities of the parties and to the marital property.

Unhappy with this result, Ms. Fuge appealed to this Court. In an unpublished opinion filed July 21, 1999 ("Opinion I"), we reviewed the trial court's findings of fact and determined that it had incorrectly used a preponderance of the evidence standard of proof in determining that the funds provided by Mr. Manfuso for the purchase of the Woodbine property were a gift to both parties. *See Fuge v. Fuge,* No. 1262, Sept. Term 1998, 127 Md.App. 782, (filed July 21, 1999), slip op. at 22. We noted that, in determining whether a valid *inter vivos* gift has been made, the appropriate standard of proof is by clear and convincing evidence. Consequently, we remanded the case to the trial court "to consider the evidence anew," using the proper standard of proof. Furthermore, for the benefit of the trial court on remand, we underscored that

the spouse claiming that the property is marital property has the burden of persuasion to establish, by clear and convincing evidence, that the third party gift was to the marital unit. Accordingly, for [Mr. Fuge] to prevail, the court must be persuaded, by clear and convincing evidence, that all three elements of a valid *inter vivos* gift were

present, as well as [Mr.] Manfuso's intention that the gift was to both [Mr. Fuge and Ms. Fuge].

*Id.*, slip op. at 24 (citations omitted)

On remand, after a hearing, the trial court decided:

[I] am not going to make any finding with regard to [FL] 8-201(e)(2) or its applicability to this case.

What I understand the Court of Special Appeals remanded the case for was for me to make a finding on the record with regard to the gift I found [Mr.] Manfuso made to the marital unit of Mr. and [Ms.] Fuge.

I applied a standard I thought was correct of preponderance of the evidence. The Court of Special Appeals says that with regard to that issue, the standard correctly is clear and convincing evidence.

So I have considered it, and for the sake of the record, I accept the testimony of [Mr. Fuge]. I believe [Mr. Fuge's] testimony is more credible than that of [Ms.] Fuge or [Mr.] Manfuso.

I believe [Mr.] Manfuso made a gift to Mr. and [Ms.] Fuge, to the marital unit, and I am convinced by clear and convincing evidence that the gift was made by him to the Fuges[.]

Mr. Fuge's counsel inquired whether the ruling applied to the $30,000 gift for construction of the addition to the Woodbine property, and the trial court replied that it did.

Unhappy once more, Ms. Fuge again appealed the trial court's decision to this Court. In an unpublished opinion filed October 26, 2000 ("Opinion II"), we again reversed the trial court's decision, citing the absence of clear and convincing evidence that Mr. Manfuso intended to relinquish all interest in the $179,000 he gave the Fuges to purchase the Woodbine property. *See Fuge v. Fuge,* No. 2432, Sept. Term 1999, 134 Md.App. 708 (filed Oct. 26, 2000). We explained that, in order to have a valid *inter vivos* gift,

"[t]here cannot be reserved to the donor a ... power to revoke the gift or a dominion over the subject of the gift[."]

Although [Mr.] Manfuso transferred the money to the parties, he clearly reserved [a power] to revoke the gift and seek repayment of the money by requiring that [Ms. Fuge] execute a demand promissory note containing a confessed judgment clause. Although [Mr.] Manfuso may have never intended to demand repayment, the fact remains that he reserved the right to do so; in effect, if it was a gift, [Mr.] Manfuso retained the right to revoke the gift.

Consequently, as [Mr. Fuge] failed to present clear and convincing evidence of one of the three elements required to establish a valid *inter vivos* gift, the money received on 26 November 1979 was a loan, not a gift. Although, [Mr.] Manfuso eventually forgave the loan, it is clear from the evidence that when he did so, he intended that the gift had been given only to [Ms. Fuge]. Therefore, the proceeds received from the sale of the Woodbine property constituted non-marital property because the source of the funds used to acquire the Woodbine property was traceable directly to a gift from [Mr.] Manfuso solely to [Ms. Fuge].

*See id.,* 134 Md.App. 708, slip op. at 19–20. We did not address the FL section 8-201(e)(2) issue because it was not decided by the trial court. Our mandate reversed the judgment and remanded the case to the trial court "for further proceedings consistent with [our] opinion[.]"

## New Developments Since The Second Appeal

In early December 2000, Mr. Fuge requested, by motion, a reduction in his child support obligation, due to his son Jeffrey reaching the age of majority, and Ms. Fuge's new employment. At the June 29, 2001 hearing on Mr. Fuge's motion, the trial court also considered the issues as directed in Opinion II. At this hearing, Mr. Fuge took the stand. He testified that he had moved the offices of his business, Jeffrey C. Fuge and Associates, from a rented office space on Old Georgetown Road to his home, "in an effort to try to save money." Since January 1999, Mr. Fuge had cut the hours of his single employee by half, due to monetary concerns.

While Mr. Fuge was on the stand, his personal financial statement, which reflected his current income, assets, and liabilities, was introduced into evidence. This financial statement listed his monthly wage income as $11,098, and his monthly income from other sources as $10,020, for a total monthly income of $21,118. Taxes attributable to this income totaled $7,469, leaving a monthly income, after taxes, of $13,649. His total monthly expenses (not including taxes), including those for his children, totaled $11,186. According to the financial statement, Mr. Fuge's total liabilities were approximately $40,000 more than his total assets.

Ms. Fuge also submitted a financial statement. Her financial statement reported her monthly income from her wages and trust account as $4,082,[1] and her monthly income from other sources (including gifts) as $3,560, for a total monthly income, before taxes, of $7,642. Taxes attributable to this income totaled $1,458, leaving a monthly income, after taxes, of $6,184. According to her financial statement, Ms. Fuge's total monthly expenses (not including taxes), including those for her children, totaled $18,319.50.[2] Her total assets were reported to be $317,700, with no reported liabilities.

Near the end of the hearing, the Court turned to the FL section 8-201(e)(2) issue.

THE COURT: ... The issue that we have to talk about now is, during the course of the trial, and even after the first decision of the Court of Special Appeals, [Mr. Fuge's attorney], on his client's behalf, has asked me on separate

---

1. Of this $4,082, apparently only $2,837 was taxable.

2. At trial, however, she testified that, although she apportioned $1,000 per month for her children's housing, and $1,500 a month for her own housing, she did not actually pay these housing expenses--this amount was simply an estimate of "what it would cost for them to live somewhere." She and her children lived with her new husband in his home. She also testified that she "[s]ometimes" paid the utilities. Her father, Mr. Manfuso, paid for many of the family vacations and other travel, as well as the car insurance for her son's car. Mr. Manfuso also paid for the children's schooling, and Ms. Fuge's attorney's fees. Nevertheless, all of these amounts were listed as monthly "expenses" in Ms. Fuge's financial statement.

occasions to rule on the issue he raised on behalf of his client, on the applicability of [FL 8-201(e)(2)] . . .; and I declined to do that, for reasons I said. . . . I don't need to rule on that because I am going to decide on other reasons. . . .

The Court of Special Appeals, on the issue raised by [Mr. Fuge's attorney] basically said we are not going to deal with that either because [the trial judge] never ruled on it; he never made the finding one way or the other, so it is really not before us to decide.

So [Mr. Fuge's attorney] comes back on behalf of his client now and says okay, so now rule on it; now rule on what I asked you to rule on previously because you have been reversed on the reason you thought you were right.; and your position is, it is too late, you cannot reopen it, the case is over. Right?

[MS. FUGE'S ATTORNEY]: I have that position and one other [one.]. . . . I looked at the opinion of the Court of Special Appeals, which says that Your Honor's decision is reversed, "Case remanded to the [trial court] for further proceeding consistent with this opinion."

It doesn't say that you now have the authority to do anything but--I mean, they are very clear instructions. When it was remanded the first time, it wasn't reversed. It was judgment affirmed in part and vacated in part, case remanded for further proceedings.

This time, I don't think the Court of Special Appeals has given you the discretion to say, gee, I am now going to decide this on another issue.

THE COURT: Okay. Well, maybe they will. I think in fairness to all parties, when they come into a courtroom, they ought to be able to have the ability to argue the position they take, whatever it is, and have somebody like me rule on whatever argument they are making; and I didn't rule on the argument made by Mr. Fuge on that issue, and I believe that there is some law to support the further consideration by me of that argument, because [Mr.

Fuge's attorney] not only couldn't get me to rule on it, he now cannot get the Appellate Court to rule on it....

[MS. FUGE'S ATTORNEY]: No, he filed for reconsideration on that specific issue of the applicability of 8-201(e)(2), and his motion for reconsideration was denied, and he then filed cert. on that exact same issue, which was also denied.

THE COURT: Well, I have been asked to rule on it. I didn't rule on it. I am going to rule on that issue ...; but do you want to make any further argument on that issue ...?

[MR. FUGE'S ATTORNEY]: Just that we think ... since the property was owned as tenants by the entireties, it is absolutely clear that [section 8-201(e)(2)] would dictate that the proceeds from the sale of Woodbine would be marital....

THE COURT: Okay. Well, I am going to, on the one hand, reopen this record to permit Mr. Fuge to make the argument he has made. On the other hand, I am denying it. I think that, one, it is clear now that the ... fund[s] ... were ... given from Mr. Manfuso to his daughter, Ms. Fuge. That is a matter of record in this case....

So the source of the funds, for the purpose of this case, is clearly Mr. Manfuso; and the record in this case is that ... the property on Woodbine that was acquired in 1979, it was titled as tenants by the entirety.... The gift was by Mr. Manfuso to his daughter. The property was titled as tenants by the entirety. It was sold ... in 1986. About $340,000 or so were the proceeds from that sale. That money was put into an account in the name of [Ms.] Fuge. Those proceeds were used to buy property on [Kerry Road], and that property was not held as tenants by the entirety.

So the issue, was, and ... is now raised, that because of-- the tenancy by the entirety property was sold in 1986; these people were divorced in 1998, 12 years later--Mr. Fuge's position is, the fact that the property was held by tenants by the entirety makes it marital property, and the new law that went into effect--the amendment was 1994--determined that; the law was prospective. This case was filed in 1995.

> I believe that the amendment in 1994 ... was limited
> ... to property that existed at the time of [the] divorce,
> and this [Woodbine] property ... was sold before the
> divorce and actually sold before the Acts went into
> effect.... And I believe it does not apply to previously
> owned property. So I am .... ruling against Mr. Fuge.[3]
> (Emphasis added.)

After the court ruled on the applicability of FL 8-201(e)(2)
to the Woodbine property, Mr. Fuge's attorney requested
that, in entering a revised monetary award in accordance with
our Opinion II, the court take into consideration the parties'
economic circumstances at the time of the hearing, not at the
time of the divorce. He argued as follows:

> [MR. FUGE'S ATTORNEY]: [W]e would respectfully sub-
> mit that the law is clear that ... one of the considerations
> that you would take into account at that point in time ...
> under [FL] 8-205, is the "economic circumstances of each
> party at the time the award is to be made"--that is to-
> day.... [W]e respectfully submit that if you look at the
> financial circumstances of the parties, that it would be
> inappropriate to enter a monetary award in favor of [Ms.]
> Fuge, and it is very clear that it is [the] financial circum-
> stances at the time the award is made--that is today.
>
> [MS. FUGE'S ATTORNEY]: Your Honor, we are back now
> to June the 26th, 1998. The Court has said that you found
> marital property of "X"--
>
> THE COURT: I think you are right.... [E]ven though we
> are right here in 2001, we are really back in 1998.

On July 10, two orders were entered, reflecting the trial
court's rulings at the June 29 hearing. In one order, the court
reduced Mr. Fuge's monthly child support obligation. In the
second, the court vacated the earlier $141,500 monetary award
in favor of Mr. Fuge, and ordered that a new monetary award

---

3. A written order to this effect was filed on July 2, 2001. In this order,
the court stated that FL section 8-201(e)(2) had "no applicability to the
facts of this case."

of $47,565.50 be entered in favor of Ms. Fuge. Thereafter, both parties appealed.

## DISCUSSION

### I.

### Application Of Family Law Section 8-201(e)(2)

Mr. Fuge first asserts error in the trial court's conclusion that the proceeds of the Woodbine property, a marital residence acquired by the Fuges during their marriage and held by them as tenants by the entirety, but sold prior to their divorce, do not constitute marital property under the definition set forth in FL section 8-201(e).

### Trial Court's Authority To Rule On The Applicability Of FL Section 8-201(e)(2)

Before we turn to the merits of Mr. Fuge's contention, we first must address Ms. Fuge's assertion that the trial court had no authority to rule on the applicability of FL section 8-201(e)(2). Apparently anticipating Ms. Fuge's argument, made both before the lower court at the June 29, 2001 hearing and in her brief to this Court, Mr. Fuge cites two cases, *Teamsters Local 639--Employers Health Trust v. Reliable Delivery Svc., Inc.,* 42 Md.App. 485, 401 A.2d 191 (1979), and *Supervisor of Assessments v. Scheidt,* 85 Md.App. 154, 582 A.2d 563 (1990), *cert. denied,* 322 Md. 240, 587 A.2d 247 (1991), in support of his contention that the court properly ruled on the FL section 8-201(e)(2) issue.

In *Teamsters Local,* the lower court interpreted the term "employee," in a collective bargaining agreement that obligated the employer to pay a certain sum per hour of employee work into a health and welfare fund, to mean "union member." On appeal, the Trust asserted that the court erred in construing the term "employee" so narrowly. While defending the lower court's interpretation of the contractual language, the employer also "interwov[e] into its brief[ ] issues of limita-

tions[.]" *Id.* at 487, 401 A.2d 191. We refused to decide the issue, concluding that

> the defense of limitations is not properly before us because, while it was raised in the trial court, the judge did not rule upon it. Inasmuch as this case shall be reversed and remanded, [the employer] will have an opportunity of presenting the matter of limitations, *vel non,* to the judge for a ruling.

*Id.* at 487–88, 401 A.2d 191. Our mandate in *Teamsters Local* read "Judgment reversed and case remanded to the circuit court for further proceedings." *Id.* at 491, 401 A.2d 191.

As in *Teamsters Local,* here Mr. Fuge requested, not once, but twice, that the trial court rule on the applicability of FL section 8-201(e)(2). On both occasions, the trial court refused to decide the issue. In the two prior appeals noted from those proceedings, we twice passed on the issue, as we did on the limitations issue raised in *Teamsters Local,* declining to decide an issue raised in, but not decided by the lower court.[1] Although we did not explicitly state that the lower court had authority to rule on the FL section 8-201(e)(2) issue on remand in Opinion II, as in *Teamsters Local,* we believe such a ruling was within the trial court's authority.

Ms. Fuge argues that *Teamsters Local* is distinguishable because the limitations defense raised in that case is a jurisdictional defense that can be raised at any time. We disagree. If our ruling in *Teamsters Local* was made on this basis, as

---

**4.** We concede that, as Mr. Fuge asserts, we may well have been able to address the FL section 8-201(e) issue in our previous opinions, simply because it was **raised** in the lower court, and despite the fact that the lower court passed on the issue. *See* Md. Rule 8-131(a). At the time *Teamsters Local* was decided, former Maryland Rule of Procedure 1085 was in effect. This rule, unlike our current Rule 8-131, enacted prior to the Fuge's divorce, provided that Maryland's appellate courts would **not** decide issues, other than those of jurisdiction, unless they were raised in **and** decided in the lower court. Unlike its predecessor rules, Md. Rule 8-131 provides that, in order to permit appellate review, an issue must have been either "raised in **or** decided by the trial court[.]" *See Supervisor of Assessments v. Scheidt,* 85 Md.App. 154, 158 n. 1, 582 A.2d 563 (1990), *cert. denied,* 322 Md. 240, 587 A.2d 247 (1991).

Ms. Fuge asserts, we would have simply considered the issue ourselves, since former Md. Rule 1085, as does our current rule, permitted the appellate courts to decide issues of the trial court's jurisdiction over the person and over the subject matter. *See* former Md. Rule 1085 (1986) ("a question as to the jurisdiction of the lower court may be raised and decided in [the Court of Special Appeals] whether or not raised and decided in the lower court"); Md. Rule 8-131(a) (2002)("The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2-322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court"). Because we hold that the lower court had the authority to rule on the section 8-201(e)(2) issue, we now address the legal correctness of that ruling.

### The Merits

FL section 8-201(e) defines the scope of "marital property."

(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.

**(2) "Marital property" includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.**

(3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) excluded by valid agreement; or

(iv) directly traceable to any of these sources.

(Emphasis added.) Subsection (e)(2) was added by an amendment effective on October 1, 1994. The "Editor's Note" following FL section 8-201 states that "Section 2, ch. 462, Acts 1994, effective Oct. 1, 1994, provides that 'this Act shall be construed only prospectively and may not be applied or interpreted to have any effect on or application to any action **filed** before October 1, 1994.' " (Emphasis added.)

Mr. Fuge challenges the trial court's ruling that FL section 8-201(e)(2) does not apply to funds resulting from the sale of the Woodbine property, acquired by the Fuges during their marriage, titled to the then couple as tenants by the entirety, and sold before their divorce. Because Ms. Fuge did not file the divorce action until 1995, he argues, application of the statute is prospective.

Ms. Fuge vigorously asserts that the legislative history of FL section 8-201(e)(2) must be consulted to fully understand its intended scope. She argues that "[w]hile the statute clearly does not apply to actions filed prior to October 1, 1994 (the effective date of the Act)[,] . . . a review of the legislative history establishes that the statute was never intended to apply to any previously owned property[.]" Thus, she asserts, applying the statute to the Woodbine property, which was sold before the effective date of the statutory change, would be an impermissible retroactive application.

"[T]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995). The best evidence of legislative intent is the plain language of the statute. *See Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001). "Ordinarily, where the language of the statute is not ambiguous or obscure, this Court need not look beyond the plain language of the statute to discern legislative intent." *Graves v. State,* 364 Md. 329, 346-47, 772 A.2d 1225 (2001). "We review the language of the contested provision in the context of the statute as a whole and with respect to the clear purposes the legislature conveyed." *Schmerling v. Injured Workers' Ins. Fund,* 368 Md. 434, 445, 795 A.2d 715 (2002).

Our examination of FL section 8-201(e)(2) convinces us that the statute contains an ambiguity that cannot be resolved solely by resort to the statute's plain language. Although section 8-201(e)(2) provides that "property held by the parties as tenants by the entirety" is considered marital property, absent a contrary agreement between the parties, the statute

is ambiguous regarding **when** the property must be held by the parties as tenants by the entirety to be considered marital property. Under section 8-201(e)(2), both Ms. Fuge's contention that the property must be held as tenants by the entirety **at the time of the divorce,** and Mr. Fuge's contention that the property must have been held by the parties as tenants by the entirety **at some time during the marriage,** are conceivable. Thus, the statute is ambiguous as to the time reference for the word "held," and we must look beyond its plain language in construing legislative intent. *See Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986) ("where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives, and purpose of the enactment").

As an initial matter, we reject Mr. Fuge's assertion that "a view of the facts and holding of ... *Grant v. Zich* [300 Md. 256, 477 A.2d 1163 (1984)] demonstrates that [section] 8-201(e)(2) does control the characterization of Woodbine and its sale proceeds as marital or nonmarital property herein." In *Grant,* a pre-section 8-201(e)(2) case, the issue was whether a home purchased by a married couple during their marriage and titled as tenants by the entirety constituted marital property. The majority of the funds used to purchase the home originated from the proceeds of the sale of a home owned solely by the husband prior to the marriage. In that case, the Court of Appeals held that, "when characterizing property as nonmarital or marital ... a presumption of gift does not arise from the titling of property as tenants by the entirety." *Id.* at 272, 477 A.2d 1163. It then proceeded to apply the source of funds theory, noting that a large portion of the funds used to purchase the marital home were "directly traceable to the proceeds" of the husband's prior home. *See id.* at 275, 477 A.2d 1163. Thus, it held that the marital home must be "characterized as part nonmarital and part marital, notwithstanding its titling as tenants by the entirety." *Id.* at 276, 477 A.2d 1163.

We do not find *Grant* to be persuasive precedent because there, in determining the applicability of the Marital Property Act, the Court employed a tracing analysis. When tracing, it is logical and reasonable to look to historical facts and origins. Here, we are simply interpreting the language of section 8-201(e)(2), and trying to determine whether the word "held" refers to "at the time of the divorce" or "at some time during the marriage."

Ms. Fuge contends that this case is analogous to *Choate v. Choate*, 97 Md.App. 347, 629 A.2d 1304 (1993), a pre-section 8-201(e)(2) case that showcased inequities that the legislature sought to remedy through the adoption of FL section 8-201(e)(2). Ms. Choate owned a home before her marriage to Mr. Choate. Shortly after the marriage, she refinanced the home. At this time, the property was placed in the names of both parties as tenants by the entirety. The Choates later divorced, and the divorce court ruled that the entire appraised value of the home was the separate non-marital property of Ms. Choate. Mr. Choate appealed, asserting that he had an interest in the property as a tenant by the entirety.

In addressing the question on appeal, we commented on the peculiar nature of the case, describing it as

that anomalous situation where the party who claims the property is nonmarital would have been better off if he or she could establish that the property was marital. In this case, no marital property existed; hence, no marital assets were available out of which to make a monetary award.

*Choate*, 97 Md.App. at 355, 629 A.2d 1304 (footnote omitted). In resolving the case, we addressed Ms. Choate's contention that to hold that she could not have property she owned outright before the marriage returned to her upon divorce simply because of a change in title "would produce an absurd result." *Id.* at 362, 629 A.2d 1304. Sympathizing with her position, but nonetheless rejecting it, we explained:

She may find it absurd, but it is precisely the result mandated by the law. That was the law before the Property Disposition Act and it is the law now. With very few

exceptions, under [FL section 8-205(a)], the court may not transfer the interest in property from one spouse to the other. The court may only make an adjustment in the form of a monetary award and then only out of marital property. The home could not have become marital property because marital property does not include property "directly traceable" to property acquired before the marriage. Hence, the absurdity that Mrs. Choate perceives reflects the statutory law.

*Id.* We therefore concluded that, although the home was nonmarital property, the Choates were nonetheless co-owners of that property. *See id.* at 365, 629 A.2d 1304. We held that it was "up to the trial court to adjust the equities to reflect the nonmarital portion of the property." *Id.* It was in large part in reaction to the perceived inequities that surfaced in *Choate* and other cases that the legislature amended FL section 8-201(e) to add a provision characterizing "any interest in real property held by the parties as tenants by the entirety" as marital property.

This case is not as closely analogous to *Choate* as Ms. Fuge suggests. The inequity in *Choate* arose because there was no marital property from which a monetary award could be made, and the equities adjusted. Thus, the hands of the trial court in *Choate* were tied due to the distinct factual nature of that case. In contrast, here the trial court's hands were not tied in determining an equitable monetary award. If FL section 8-201(e)(2) applies to the Woodbine property, as Mr. Fuge suggests, the proceeds from its sale would be placed in the marital property "pot" from which the monetary award is made. The trial court, however, would still have the option of giving a greater award to Mr. Fuge if it believed the equities lay in his favor,[5] effectively ignoring Mr. Manfuso's contribution. Alternatively, it could decline to award anything to Mr. Fuge if it believed the equities lay in Ms. Fuge's favor because

---

5. In fact, the trial court explicitly found that Ms. Fuge had "assured" Mr. Fuge that he would share equally in her assets. This finding was not disturbed or otherwise affected by our decisions in Opinions I and II.

she contributed the larger share of the purchase price of the Woodbine property. While *Choate* presented the rare situation in which the trial court's hands were tied in adjusting the equities **because there was no marital property from which to grant a monetary award,** such a situation simply does not exist here.

Rather, the legislative reaction to *Choate* problems supports **Mr.** Fuge's position in the sense that the legislature included tenants by the entireties property as marital property, as Mr. Fuge seeks to do here. As we discuss further below, the legislature did not clarify what the result would be if the property was sold before the divorce.

The addition of subsection (e)(2) to FL section 8-201 resulted from a recommendation of the *Subcommittee on Marital Property Distribution* ("the Subcommittee"). The Subcommittee was formed in 1991 "to examine and discuss the Marital Property Act and related caselaw to determine the economic consequences of divorce under the Act." Rept. of the Subcommittee on Marital Property Distribution at 1 ("Subcommittee Rept."); *see State v. White,* 348 Md. 179, 194-95, 702 A.2d 1263 (1997)(looking to subcommittee report proposing statutory change to ascertain legislative intent).

In its report to the legislature, the Subcommittee discussed the issue of "whether the presumption of gift doctrine should apply in a determination of the existence of marital property, thus allowing all jointly titled property to be classified as marital property from which a monetary award could be granted." Subcommittee Rept. at 1-2. Because the state of mind of the Subcommittee members in recommending the legislative change is so vitally important to our understanding of the reach of the statute, we set forth a substantial portion of the Subcommittee's report below.

The Subcommittee found "great disparity and inconsistency" in

> the determination of whether all or a portion of a parcel of jointly titled property has been given as a gift from one spouse to the other. These inconsistencies, reported by

members of the Subcommittee and evident in the appellate decisions on the issue, have led to inequitable economic consequences at the time of divorce.

Under the common law of Maryland, when a spouse titles property as tenants by the entirety, a presumption of gift to the other spouse arises, and upon dissolution of the marriage one-half of the property constitutes the donee spouse's separate property. Consider the following example: a couple is married and purchases a house for $50,000. The husband contributes $45,000 of non-marital property from an inheritance. A loan is obtained for the remaining $5,000, the monthly payments on which are made from the parties' salaries, clearly marital property. The property **is titled as tenants by the entirety.** The wife has a 50% interest in the home at the time of divorce under the common law of property because, although he made a contribution of substantially the entire purchase price of the house, the property was titled jointly.

However, the Court of Appeals held in *Grant v. Zich,* 300 Md. 256, 477 A.2d 1163 (1984), that when characterizing property as marital or non-marital for the purpose of granting a monetary award, the presumption of gift doctrine does not arise from the titling of property as tenants by the entirety. Thus, in the previous example, if the house was worth $70,000 at the time of divorce, the wife would have a 50% property interest in the house and would be entitled to $35,000.

Because the presumption of gift doctrine does not apply to the determination of marital property, a [c]ourt would likely find that 90% or $63,000 of the property is non-marital and that 10% or $7,000 is marital property. It seems that the equitable property distribution would be to award the husband the $45,000 which was his non-marital contribution, and to divide the marital proceeds of $25,000 between the parties.

However, in *Watson v. Watson,* 77 Md.App. 622, 551 A.2d 505 (1989), the Court of Special Appeals determined that, regardless of the non-marital contribution, **when property is titled jointly,** each party is entitled to 50% of the

proceeds. In the example, each party would be entitled to $35,000. The Court went on to say that the monetary award, allowable under [FL section 8-205], is to be used to adjust any inequities which exist. The monetary award, however, can only be made from that portion of the assets which have been determined to be marital property, in the example, $7,000. Thus, assuming there is no other marital property, the maximum amount that the husband could receive in the example is a monetary award for $7,000 in addition to his $35,000 share of the proceeds. Under existing law, although the husband's non-marital contribution was 90% of the value of the property, the most that he can receive at the time of the divorce is 60% of the value of the property. It is unlikely that a [c]ourt would award the total value of the marital property to the husband and, in any event, he would receive substantially less than his non-marital contribution to the acquisition of the house.[6]

*FINDINGS:*

A. There are many instances where one spouse makes a substantial non-marital contribution to acquire marital property.

B. There exist inconsistencies in the law governing distribution of the proceeds of property of which a portion is non-marital.

C. Because a monetary award can only be made from that portion of the property which is marital and because the marital portion is often minimal, the contributing spouse often receives less than a fair return on his/ her non-marital investment.

D. The property distributions which result from the application of the law often have severe economic consequences for the spouse who made the non-marital contribution.

*Id.* at 3–6.

Based on these findings, the Subcommittee recommended that the legislature add an amendment to section 8-201(e),

---

**6.** This is precisely the legal scenario that unfolded in *Choate. See Choate v. Choate,* 97 Md.App. 347, 629 A.2d 1304 (1993).

providing that "ANY INTEREST IN PROPERTY HELD BY A HUSBAND AND WIFE IN TENANCY BY THE EN-TIRETY IS 'MARITAL PROPERTY.' " *Id.* at 6. According to the Subcommittee,

> [t]he effect of this amendment would be to allow the entire property in the example to be classified as marital property. Because the property **is titled jointly,** under the proposed statute, the non-marital contribution to the acquisition of the property would not preclude classification of the entire property as marital. The benefit of such a classification is that the total value of the property can now be used by the Court to make a monetary award if it finds that such an award is warranted.

*Id.* The Subcommittee's recommended change to FL section 8-201(e) was adopted by the legislature in 1994 as Senate Bill 41. *See* 1994 Md. Laws, ch. 462.

■ We believe that the language of the Subcommittee Report evidences a legislative purpose to protect at least those spouses who contribute more than half of the money used to buy property that is held by both spouses as tenants by the entirety at the time of divorce. The same need for protection of such spouses would arise, however, when property that was once held by the parties as tenants by the entirety is sold during the marriage, with the proceeds placed in a joint bank account.[7] For this reason, we are reluctant to accept Ms. Fuge's argument that section 8-201(e)(2) does not apply unless the tenants by the entireties property is held at the time of divorce.

Although it does not appear that the Subcommittee or the legislature actually considered whether the amendment would

---

7. Upon divorce, parties owning a joint bank account become tenants in common, entitling each to 50% of the account balance. *See Sody v. Sody,* 32 Md.App. 644, 656-57, 363 A.2d 568 (1976)(upon divorce, parties owning joint bank account converted to tenants in common, with each entitled to a one-half interest in the balance of the account where "the parties mutually intended the funds [in the joint account] to be used for family purposes"); *Gravenstine v. Gravenstine,* 58 Md.App. 158, 179, 472 A.2d 1001 (1984).

apply to circumstances in which the property in question was sold **before** the divorce, the language of the statute permits such interpretation. The temporal language of the Subcommittee Report suggests that the Subcommittee focused only on situations in which the property in dispute is owned jointly by the parties **at the time of the divorce.** In its report, the Subcommittee refers multiple times to property that "**is** titled jointly," and makes no reference to property that "was" titled jointly. Furthermore, it speaks of the property itself, not the **proceeds** of property once titled jointly. But section 8-201(e)(2), by its terms, refers to "any interest ... held by the parties as tenants by the entireties," without an express requirement that the real property be owned at the time of the divorce.

In the past, Maryland courts have construed ambiguous statutes in accordance with evident legislative purposes, even when, as here, there is nothing in the legislative history to suggest that the legislature considered such an application. In *Shapiro v. Shapiro,* 346 Md. 648, 697 A.2d 1342 (1997), for example, the Court of Appeals interpreted FL section 8-103(c), which concerns the modification of support agreements. The statute provides that a court "may modify any provision of a deed, agreement, or settlement with respect to alimony or spousal support executed on or after April 13, 1976, regardless of how the provision is stated, unless there is ... (2) a **provision** that specifically states that the **provisions** with respect to alimony or spousal support are not subject to any court modification." The support agreement at issue in *Shapiro* provided that the amount of spousal support could be court-modified only in the event of Mr. Shapiro's temporary or permanent disability, but that support otherwise was not to be modified. Affirming the circuit court, this Court held that, if any provision in the agreement was modifiable, then **all** provisions in the agreement were modifiable.

The Court of Appeals reversed. It found the statute ambiguous as to whether the legislature intended it to be applied in an "all or nothing" manner. *See id.* at 657, 697 A.2d 1342. It therefore turned to the statute's legislative history. The legis-

lative history of FL section 8-103(c)(2), however, did not resolve the ambiguity. The Court concluded:

> [W]e have uncovered nothing in the legislative history that indicates that the General Assembly ever focused on the issue with which we are here concerned. Thus, in order to construe the statute on the issue here, we examine the General Assembly's purpose in enacting it.... [T]he statute's immediate purpose was to permit court modification of contractual support, unless the parties otherwise agreed, by eliminating, in the modification context, the distinction between technical alimony and contractual support. The ultimate purpose was to prevent the unintended results under separation agreements that were produced by the technical alimony-contractual support dichotomy.

> If the statutory exception to the general rule of modifiability is read to require a blanket provision, making nonmodifiable each and every provision in a package of provisions relating to spousal support, then the evil that the General Assembly sought to cure by § 8-103(c)(2) is recreated. The only difference is the nature of the contractual intent that is frustrated.... We can discern no legislative purpose to substitute one form of frustration of contractual intent for another in a statute intended to fulfill expectations based on the parties' agreement. Nor do we discern in this statute, that was intended to abolish the technical alimony-contractual support distinction, an intent to perpetuate the all or nothing approach to modifiability that characterized that prior law.

*Id.* at 663, 697 A.2d 1342 (citation omitted). Accordingly, the Court held that the spousal support provision was not modifiable, consistent with the parties' agreement.[8]

As in *Shapiro,* we find the language of FL section 8-201(e)(2) ambiguous. While our examination of the statute's legislative history has revealed a legislative purpose to protect

---

8. Mr. Shapiro had not become temporarily or permanently disabled at the time that he sought modification of the spousal support provision. *See Shapiro v. Shapiro,* 346 Md. 648, 652-53, 697 A.2d 1342 (1997).

spouses who contribute more than half of the money used to buy property that is then held by both spouses as tenants by the entirety, we "have uncovered nothing in the legislative history that indicates that the [legislature] ever focused on the issue with which we are here concerned," *id.,* namely, application of the statute to property held by the parties as tenants by the entirety at some time during the marriage, but sold before the divorce. Therefore, following the lead of the *Shapiro* Court, we will resolve the ambiguity by interpreting the statute in a manner that furthers its legislative purpose.

■ While the legislature does not appear to have considered such an application, we believe that it would be consistent with the overall purpose of the statute. As we discussed earlier, the legislative history of section 8-201(e)(2) reveals a legislative purpose to protect spouses who contribute more than half of the money used to buy property that is then held by both spouses as tenants by the entirety. Denying the statute's protection to part of that class of persons by construing it to apply only to cases in which the property is still owned by the parties at the time of the divorce would thwart that purpose. Thus, in interpreting the statute to further its legislative purpose, we hold that FL section 8-201(e)(2) applies to property held by the parties as tenants by the entirety at any time during their marriage, whether or not it is still held by them at the time of the divorce. Any other interpretation would not only frustrate the legislature's purpose in passing the statute, but also "recreate" the "evil that the [legislature] sought to cure" thereby. *See id.*

■ Our analysis does not end here, however, because there remains the issue of retroactivity. "It is a basic rule of statutory construction that '[a] statute is presumed to have prospective effect only, unless there is a clear legislative intent that the statute operate retroactively.'" *Scroggins v. Dahne,* 335 Md. 688, 694, 645 A.2d 1160 (1994)(citation omitted).

Moreover, even where permissible, retrospective application is not found except upon the plainest mandate in the legislation. The rationale underlying the general rule pro-

vides that retrospective application, which attempts to determine the legal significance of acts that occurred prior to the statute's effective date, increases the potential for interference with persons' substantive rights.

*Washington Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.*, 308 Md. 556, 561, 520 A.2d 1319 (1987)(citations omitted).

■ Here, Woodbine was sold eight years **before** the October 1, 1994 effective date of the statute, while Ms. Fuge's divorce action was filed **after** the effective date. As outlined earlier, Mr. Fuge argues that the fact that the legislature specified that the statute "shall be construed only prospectively and may not be applied or interpreted to have any effect on or application to any **action filed** before October 1, 1994," indicates that the statute does apply to Woodbine because Ms. Fuge's divorce action was filed after the effective date of the statute. We reject this contention.

Because the legislature was considering only situations in which the property was still held by the parties at the time of their divorce, in considering the effective date of the statute, it was focusing on whether the statutory amendment would apply to pending cases, *i.e.*, cases in which the divorce complaint had already been filed. In deciding that section 8-201(e)(2) would not apply to pending cases, the legislature stated that the statute was "prospective only," and clarified that it was not applicable "to any action filed before [the effective date of the Act]." *See* Editor's Note, FL § 8-201. In light of the **context** of this statement by the legislature, we do not find persuasive Mr. Fuge's argument that, because Ms. Fuge filed her divorce action after the effective date of the statute, section 8-201(e)(2) applies to Woodbine in a prospective application, rendering its proceeds marital property. The legislature simply did not consider such a scenario when it decided that the statute would apply to "actions filed" after the statute's effective date. This certainly does not amount to a "clear legislative intent that the statute operate retroactively." *Scroggins*, 335 Md. at 694, 645 A.2d 1160.

We see no evidence of a legislative intent that the statute apply retroactively. Accordingly, we hold that, even though FL section 8-201(e)(2) applies to property held by the parties as tenants by the entirety at any time during the marriage, a class of property to which Woodbine belongs, the statute cannot be applied to Woodbine because that property was sold before the statute's effective date, October 1, 1994. Thus, the trial court correctly held that FL section 8-201(e)(2) does not apply to Woodbine.

Because we resolve the section 8-201(e)(2) issue in her favor, we need not address Ms. Fuge's alternative argument under FL section 8-205(b)(9).

## II.

### Economic Circumstances Considered In Calculating Monetary Award

Mr. Fuge next argues that, in calculating the amount of the 2001 monetary award, the trial court erred in considering each party's economic circumstances at the time of the divorce in 1998, rather than at the time the 2001 monetary award was made. Mr. Fuge asserts that FL section 8-205(b)(3), by its plain language, requires a court to consider the parties' economic circumstances "at the time the award is to be made" in determining the amount of the monetary award. According to Mr. Fuge, "[t]his is significant here because Ms. Fuge's financial circumstances in June 2001 were much improved over those of June 1998."

Ms. Fuge asserts that the economic circumstances of each party is but one of many factors a court must consider in determining the amount of any monetary award for purposes of equitable distribution of marital property, and that the other factors support the trial court's allocation. Further, she asserts that it would be unfair to penalize her for appealing the trial court's prior awards, which resulted in the three-year delay between the parties' divorce, and the 2001 award.

FL section 8-205 directs the court to consider eleven factors before "determin[ing] the amount and the method of payment" of any monetary award to be granted "as an adjustment of the equities and rights of the parties concerning marital property:

(1) the contributions, monetary and non-monetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) the contribution by either party of property described in § 8-201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

It is the court's consideration of the third factor, "the economic circumstances of each party at the time the award is to be made," that Mr. Fuge challenges in this appeal.

As outlined earlier, the trial court explicitly stated that it was considering the parties' economic circumstances in 1998

when making the 2001 award. In response to Mr. Fuge's contention that it must consider the parties' economic circumstances in 2001, the court announced, "Even though we are right here in 2001, we are really back in 1998."

Originally, in 1998, the trial court split the previously-determined amount of marital property 50/50, resulting in a $141,510 award to Mr. Fuge. In 2001, the court simply deducted Woodbine from the marital property amount and again split the new marital property amount 50/50, resulting this time in a $47,565.50 award to Ms. Fuge. This amount represented 50 percent of the 1998 value of Mr. Fuge's business.

Mr. Fuge cites a single out-of-state case, in addition to the plain language of section 8-205, in support of his position. According to Mr. Fuge, the court in *McDiarmid v. McDiarmid,* 649 A.2d 810 (D.C.Ct.App.1994), held that it is "implicit in the provisions governing equitable distribution that the valuation date be reasonably proximate to the date of distribution."

*McDiarmid* involved an approximately 17 month delay between the trial and the trial court's issuance of the original monetary award. *See id.* at 811–12. It was during this time period that the value of certain marital property was alleged to have substantially changed. The District of Columbia Court of Appeals addressed "whether the trial court abused its discretion in failing to revalue" these assets as of the time of the award, rather than relying on the values determined at trial. *See id.* at 812. In answering this question, the court noted that the D.C. statute governing equitable distribution did not specify a valuation date that must be used by the trial court, but did require the court to "distribute all property accumulated during marriage 'in a manner that is equitable, just and reasonable.'" *See id.* In holding that the trial court indeed had erred in failing to revalue the property, the *McDiarmid* court explained:

> The distribution of property upon dissolution of marriage should be responsive to the parties' then current needs and circumstances. An equitable distribution requires the court

to consider the current values of the marital property, such that upon distribution, each party's needs are adequately addressed. We recognize that it is within the trial court's discretion to "adopt a date for valuation which best works economic justice between the parties." Thus, we do not endeavor to establish as a matter of law a valuation date to be used in every situation. Nonetheless, there are circumstances in which the distribution of assets based on stale valuations violates the provisions of [the D.C. statute], requiring that the distribution be equitable, just and reasonable. The case before us today presents such a circumstance.

*Id.* at 813 (citation omitted).

Although *McDiarmid* did not concern the recalculation of an earlier monetary award, as in this case, we agree with the basic principles espoused by the *McDiarmid* court. Although our case does not concern stale valuation of marital property, but instead "stale economic circumstances," we believe the reasoning extends to our situation.

■ We agree with Mr. Fuge that the plain language of FL 8-205(b)(3) mandates that the trial court consider the parties' economic circumstances at the time the award is made. We also hold that the trial court must keep in mind all eleven of the section 8-205(b) factors upon remand. The modification of an original monetary award on remand is still an "award," triggering consideration of the section 8-205(b) factors.

It is logical that a trial court be required to reconsider the section 8-205(b) factors, even in a case such as this, where it essentially is revising an earlier monetary award.[9] The weight that a court gives to the section 8-205(b) factors, and the size and nature of its ultimate award, may depend on the amount of marital property to be distributed.

9. This is especially true when, as here, one party highlights a specific factor that it believes has changed substantially since the original award.

 When the extent of the marital property has changed due to an appellate decision, the trial court should rethink whether its original method of allocation is still "equitable" in light of the new circumstances. Further, the court must carefully consider whether there have been any other changes in circumstance since its original award that may have caused the equities to shift, justifying a different allocation of the marital property.

Trial judges should not be encouraged to simply take out their rubber stamps when faced with a remanded monetary award, automatically allocating the new marital property amount in the same manner as in the original award. To do so could result in inequitable and unjust awards.

While we sympathize with Ms. Fuge's argument that she should not be penalized for noting an appeal from the original judgment, we conclude that requiring a reconsideration of the section 8-205(b) factors to ensure an equitable award is not a penalty. It instead ensures justice. While she may feel penalized by reconsideration, it would be an affront to justice to allow her to benefit from any windfall she might be afforded if the court did not take a fresh look at the parties' circumstances to ensure the "equitable" award that the law requires.

We hold that the trial court erred in failing to reconsider the section 8-205(b) factors, specifically factor 8-205(b)(3), upon making its 2001 award in response to our decision in Opinion II. We therefore remand this issue to the trial court for a fresh consideration of the section 8-205(b) factors.

### III.

### Private Schooling

The sole issue raised by Ms. Fuge in her cross-appeal is whether the trial court erred in finding that Mr. Fuge was not obligated to pay any portion of the Fuge children's private school tuition, after determining that the children had a "particular educational need" for that schooling under FL section 12-204(i).

FL section 12-204(i) provides that a court may order that "any expenses [incurred] for attending a special or private elementary or secondary school to meet the particular educational needs of the child[ren]" be "divided between the parents in proportion to their adjusted actual incomes." We interpreted the meaning of the term "particular educational need" in *Witt v. Ristaino,* 118 Md.App. 155, 701 A.2d 1227 (1997). In that case, we held that, in determining whether a child has a "particular educational need," a court should "consider whether to attend or remain in a special or private school is in the child's best interest and whether and how parents are required to contribute to that expense." *Id.* at 169, 701 A.2d 1227. In making that determination, the *Witt* Court put forth a "non-exhaustive" list of factors to be considered. These factors include (1) "the child's educational history," (2) "the child's performance while in the private school," (3) "family history," (4) "whether the parents had made the choice to send the child to the school prior to their divorce," (5) "any particular factor that may exist in a specific case that might impact upon the child's best interests," and (6) "the parent's ability to pay for the schooling." *Id.* at 170–71, 701 A.2d 1227.

At the June 2001 hearing on the issue of child support, Mr. Fuge testified that the children began attending private school before his separation from Ms. Fuge.

[MR. FUGE'S ATTORNEY]. While you and your wife were still living together, who paid the private school tuition?

[MR. FUGE]. The children's grandfather.

Q. Have you ever had occasion to pay the private school tuition?

A. No, sir.·.... It's always been paid for by their grandfather, and I cannot afford the tuitions of the schools they go to. . . .

Q. What, if anything, did your wife tell you about who was going to pay for the private school tuitions for the children?

A. She explained to me that her father was going to pay for the private school tuition of our children.

Despite his initial statement that he had never paid private school tuition, Mr. Fuge conceded during cross-examination that he had indeed "paid for Blessed Sacrament School" for at least one of his children, though he could not specify which one.

Later, Ms. Fuge took the stand, and testified as follows:

[MS. FUGE'S ATTORNEY]. [H]ave [your children] always attended private school?

[MS. FUGE]. Yes, they have.

Q. And did they do that even when you and Mr. Fuge were living together?

A. Yes, they did.

Q. And who paid for it before the two of you began having marital problems and you then separated?

A. Well, Mr. Fuge paid for St. Patrick's, Blessed Sacrament, Chevy Chase Methodist, the Baptist church school that the children went to when they were younger, and when they started at [Stone Ridge] and Mater Dei my father and mother started paying their tuition.

Q. And was that around the time, or shortly before the time you separated that they started at Stoneridge and Mater Dei?

A. Yes....

Q. Did Mr. Fuge ... indicate that he did not want the children in private school?

A. No.

Ms. Fuge described the schools that her three children were attending at the time of the hearing. According to Ms. Fuge, Tommy was an eighth-grader at Mater Dei, which he had attended since the first grade; Ally was a high-school sophomore at Stone Ridge, which she had attended since the third grade; and Jeffrey was a rising senior at Episcopal High School, a boarding school that he had attended since his sophomore year.[10] Ms. Fuge testified that, when she received

---

10. According to Ms. Fuge's financial statement, the base tuition amounts for the children's schools for the 2001/02 school year were as

the children's tuition bills, she would forward them to her father's office, which would pay them. She explained that there was no agreement with her father guaranteeing that he would pay the children's tuition in the future.

We will not reverse a trial court's factual findings unless clearly erroneous. *See Noffsinger v. Noffsinger,* 95 Md.App. 265, 285, 620 A.2d 415, *cert. denied,* 331 Md. 197, 627 A.2d 539 (1993). If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous. *See Fantasy Valley Resort, Inc. v. Gaylord Fuel Corp.,* 92 Md.App. 267, 275, 607 A.2d 584, *cert. denied,* 328 Md. 237, 614 A.2d 83 (1992). We review the trial court's first-level findings as to the *Witt* factors, and its overall finding that Mr. Fuge is not obligated to contribute to his children's private school tuition, under this standard.

Considering the *Witt* factors, the court found that the Fuge children had a history of private education, that they were "doing good in school," and that the family had a tradition of attending private school. As to the fourth *Witt* factor, whether the parents chose prior to their divorce to send their children to private school, the court "[found] as a fact that the parties did agree that the children would attend private school. There was no specific agreement between them as to payment, but there was a representation by Ms. Fuge that her father would pay."

After explicitly finding that it was in the children's best interests to continue their private education, the court found, as to the sixth *Witt* factor, that Mr. Fuge did not appear to have the **ability** to pay. The judge stated:

[I]t is very difficult for me, or somebody like me, to find that someone like Mr. Fuge, who does make about a quarter of a million dollars a year, can't afford to pay for or contribute to, the private education of his children, but the fact is he can't.

follows: Mater Dei--$8,900, Stone Ridge--$15,280, and Episcopal--$26,000.

He has submitted a financial statement, lots of financial records have been put into evidence, and there is no evidence that Mr. Fuge has money in a secret account someplace and is stashing money somewhere.

There does appear to be a balance at the end of each month based on his financial statement, but it's not reflected in his asset column. He has got a little bit of money, but you would think that somebody who makes as much money as he does a year gross would have more assets, but he doesn't.

So I find, having considered all the factors, one, Ms. Fuge did represent a promise that her father would pay for it. I recognize that her father has no obligation to pay for the private education of the children. It is wonderful that he is doing it, and the parties and their children are lucky that he is generous enough to pay for the education; but Mr. Fuge, I find, does not have the **obligation** to pay for the private education.

Ms. Fuge argues that the trial court's finding that Mr. Fuge did not have the **ability** to contribute to the children's private school tuition was clearly erroneous. She asserts that Mr. Fuge's financial statement, admitted into evidence, demonstrates that he had a substantial amount of monthly income after taxes and expenses.

For the year 2000, Mr. Fuge listed his monthly wage income as $11,098, and his monthly income from other sources as $10,020, for a total monthly income of $21,118. Taxes attributable to this income totaled $7,469, leaving a monthly income, after taxes, of $13,649. His total monthly expenses (not including taxes), including those for his children, totaled $11,186.[11]

---

11. Mr. Fuge's financial statement reflected a $2,000 monthly deduction for "Retirement," though a footnote appended to the statement clarified that Mr. Fuge was not **actually** reserving this amount. Instead, Mr. Fuge indicated that "If I am able to do so, I would like to set aside this amount on a monthly basis as a contribution to a retirement plan and/or as a cushion in the event of an emergency. To date, I have been unable to do so." In our calculations, we treat this monthly retirement deduction as an expense.

Thus, he had $2,463 per month available to save. According to his financial statement, Mr. Fuge's total liabilities were approximately $40,000 more than his total assets.

Given this evidence, we hold that the trial court's finding that Mr. Fuge lacked the **ability** to contribute to his children's tuition was clearly erroneous. Mr. Fuge's financial statement indicates that, after payment of taxes and expenses, he could save $2,463 per month, or $29,556 per year. This is not an inconsequential amount, and is certainly more than the "little bit of money" that the court characterized it. Surely, someone who has $29,556 per year available for savings, after all expenses, including retirement contributions, is **able** to contribute to his children's private school tuition. His past expenditures of income, resulting in a $40,000 negative net worth, do not justify a finding that, given his current income and expenses, he is unable to pay for private schooling.

His ability to pay, however, is not the only pertinent factor. After finding that Mr. Fuge was unable to contribute to private school tuition, the trial court later concluded that Mr. Fuge had **no obligation** to so contribute to the tuition, apparently due to Ms. Fuge's "representation that her father would pay." Deciding that Mr. Fuge had no obligation to pay based on this representation certainly is permissible. Because the court relied in part on its clearly erroneous factual finding that Mr. Fuge was **unable** to pay, however, we cannot affirm its decision. Thus, we remand this issue in order for the trial court to reconsider the *Witt* factors, and take a fresh look at whether Mr. Fuge has an **obligation** to contribute in light of his **ability** to do so based on his financial statement.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT/CROSS-APPELLEE.**